No. 95-138

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

ROBERT CARTWRIGHT, FERRIS H. (BUSTER)
NESS and GRACE NESS, husband and wife,

       Plaintiffs, Respondents,
       and Cross-Appellants,

  v.

THE EQUITABLE LIFE ASSURANCE SOCIETY
OF THE UNITED STATES and BLAINE LeSUER,

       Defendants, Appellants,
       and Cross-Respondents.

FILED

APR 15 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Twelfth Judicial District,
               In and for the County of Hill,
               The Honorable John Warner, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

          Richard E. Gillespie, Keller, Reynolds, Drake,
          Johnson & Gillespie, Helena, Montana
          (attorneys for The Equitable)

          Theodore K. Thompson, Attorney at Law,
          Havre, Montana (attorney for Blaine LeSuer)

     For Respondents:

          Ward E. Taleff, Alexander, Baucus,
          & Paul, Great Falls, Montana

          Brian Lilletvedt, Bosch, Kuhr, Dugdale,
          Martin & Kaze, Havre, Montana

Submitted on Briefs:  October 19, 1995

Decided:  April 15, 1996

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The plaintiffs, Robert Cartwright, Ferris H. (Buster) Ness, and Grace Ness, commenced this action by amended complaint filed in the District Court for the Twelfth Judicial District in Hill County. They alleged that the defendant, Blaine LeSuer, in his capacity as an agent for the defendant, The Equitable Life Assurance Society of the United States, misrepresented the terms of life insurance policies that he sold to them, that they relied on those misrepresentations to their detriment, and that as a result of the defendants' conduct, they were entitled to compensatory and punitive damages. The defendants denied the material allegations of the plaintiffs' amended complaint and asserted various affirmative defenses.

Following a jury trial in Hill County, the jury returned a verdict in favor of the plaintiffs in which it found that the defendants were liable to the plaintiffs for compensatory damages based on breach of fiduciary duty, negligent misrepresentation, negligence, constructive fraud, and actual fraud. The jury also found that the defendants were liable for punitive damages. They awarded actual damages to Cartwright in the amount of $144,025, to Grace Ness in the amount of $44,738, and to Buster Ness in the amount of $169,828. After considering further evidence and arguments, the jury returned punitive damage awards in favor of the plaintiffs in the amount of $30,000 against LeSuer, and in the amount of $6,127,845 against Equitable. Following its statutory review of the jury's punitive damage awards, the District Court

2

reduced the amount assessed against LeSuer to $18,000, and reduced the amount assessed against Equitable to $4,000,000.

LeSuer and Equitable appeal from the judgment entered against them. Cartwright and Grace and Buster Ness cross-appeal the District Court's reduction of the jury's punitive damage awards. We affirm the jury's verdict, reverse the order of the District Court which reduced its verdict, and remand for entry of judgment consistent with the jury's verdict.

Although numerous issues are raised by LeSuer and Equitable, we conclude that the following issues are dispositive of their appeals:

1. Were the plaintiffs' claims barred by the applicable statutes of limitations?

2. Did the District Court abuse its discretion when it admitted evidence that LeSuer had similarly misrepresented the terms of policies to other individuals? If not, did the District Court err by precluding further evidence of the specific manner in which those person's claims against Equitable were resolved?

3. Was the jury's finding that the defendants committed fraud supported by substantial evidence?

4. Was the jury's award of actual damages supported by substantial evidence?

5. Did the District Court abuse its discretion when it refused to instruct the jury that plaintiffs could not recover for fraud in light of their failure to examine the insurance policies they purchased?

3

6. Was there substantial evidence to support an award of punitive damages against each defendant?

7. Should the plaintiffs' compensatory damage awards be reduced by a percentage equal to the degree to which the jury found that each plaintiff was contributorily negligent?

8. Did the District Court err by its award of punitive damages made pursuant to § 27-1-221, MCA?

The issue raised by the plaintiffs' cross-appeal is whether the District Court erred when, pursuant to its statutory obligation to review the jury's punitive damage awards, it reduced the amounts of those awards.

## FACTUAL AND PROCEDURAL BACKGROUND

Buster Ness had been insured by Equitable Life Assurance Company since he was eleven years old when his father purchased a life insurance policy for him. In 1950, when he was 21, he purchased his own retirement policy from Equitable.

Buster first met Blaine LeSuer in 1962 when he began purchasing chemicals from LeSuer's chemical supply business for use in Buster's crop spraying business. Although that business relationship ended in the 1960s, the two of them stayed in touch with each other occasionally and Buster would contact LeSuer when he had questions regarding the chemical business.

After working out of state with other firms for a period of years, LeSuer applied for employment with Equitable and received his license to sell life and disability insurance in 1980. After he became an insurance agent he continued to stop at Ness's place

4

of business periodically to discuss the chemical business and occasionally inquire about Buster's or Grace's life insurance needs.

In April 1982, Buster agreed to purchase and LeSuer agreed to sell on behalf of Equitable, a whole life insurance policy insuring the life of Grace Ness for the face amount of $25,000. Page three of the policy indicated that the premium period was thirty-five years and that the annual premium was $541.25. However, Grace testified that they were told by LeSuer that they would only have to pay premiums for four or five years and that after that time the policy would be self-sustaining. They paid the premiums for that policy through 1985. However, when they got a premium notice in 1986, they contacted LeSuer to find out why they had received an additional premium notice. According to the Nesses, he advised them "not to worry about it." He told them that it was a bookkeeping error at Equitable's home office and that he would take care of it. When, in subsequent years, they received similar premium notices which by then indicated that loans had been advanced against the policy value to pay the previous year's premium, they had similar conversations with LeSuer and, according to their testimony, were given similar assurances.

In 1982 Buster and Bob Cartwright applied for an SBA loan to operate their agricultural products business. They were advised by their banker that they would need $150,000 of life insurance per person to guarantee repayment of the loan in the event that either of them died before it was repaid. After discussing the loan

5

requirements with LeSuer, each of them agreed to purchase from him and Equitable a convertible term life insurance policy for the face amount of $150,000. Those policies were issued in June 1982. They are not the subject of plaintiffs' claims, but were converted to whole life insurance policies in 1986 and 1988 which are the subject of the plaintiffs' claims.

During 1982 Buster and Grace also purchased convertible term life insurance policies from LeSuer and Equitable insuring each of their lives for the face amount of $100,000 to assure payment of the debt which was secured by their farm. Neither are those policies the subject of the plaintiffs' claims. However, they were also later converted to whole life policies which are the subject of their claims.

In 1983 LeSuer advised Buster that he could replace the retirement policy Buster had purchased in 1950 by converting it to a better policy with greater coverage. Grace also testified that they were told by LeSuer that only four or five premium payments would have to be made by them to purchase paid up coverage under the new 1993 policy. Buster testified that they were told that premiums would eventually be paid on the policy from accumulated dividends which the policy earned. Premium payments were made for that policy in 1983, 1984, and 1985. When the fourth premium notice was received in 1986, there apparently was some confusion about how many premiums would be due. According to Buster, he contacted LeSuer and was advised that there had been a computer mixup, that he should not worry about it, and that LeSuer would

6

take care of it. The next premium notice was received in 1987 and showed that a loan had been taken against the policy to pay the previous year's premium. He recontacted LeSuer and, according to him, was given similar assurances during that and subsequent years.

In 1986 the premium for Buster's $150,000 term life policy, and for Buster's and Grace's $100,000 term policies had increased substantially and so they discussed alternatives with LeSuer. He suggested that the three policies be converted to whole life policies. According to Buster and Grace, he told them that after three premium payments the policies would be self-sustaining and they would not have to make the future premium payments. Based on those representations, Buster purchased whole life policies for the face amount of $150,000 and $100,000 from Equitable in 1986. An additional whole policy in the face amount of $100,000 was issued by Equitable to Grace in 1986. The third page of Buster's 1983 whole life policy indicated that premiums were due for thirty years. The third page of the whole life policies purchased by Buster and Grace in 1986 indicated that premiums were due for life. However, Grace testified that when the policies were delivered by LeSuer he did not bother to explain the terms, or suggest that they read them. She stated that he simply said to put them in a safe place and if they ever had a question that he would help them with it.

The Nesses paid premiums for the whole life policies they purchased in 1986 during 1986, 1987, and 1988. When they received premium notices in 1989, they testified that they contacted LeSuer

7

and received the same assurances that they had received regarding their previous policies. They testified that they were told that there had been a mistake, that they should not worry about it, and that he would take care of it. Finally, when they received notices in February 1990 indicating that loans were being taken against their policies, they again tried to contact LeSuer but were advised that he had been terminated from employment with Equitable and were referred to Equitable's office in Billings. There they talked to a gentleman by the name of Brad Schaffer who told them not to pay any more premiums until their questions could be resolved to their satisfaction. They learned for the first time in January or February 1990 during conversations with Shaffer that there was no such thing as an Equitable whole life policy which was self-supporting after three payments, and that they actually had problems with their policies other than bookkeeping errors.

Buster and Grace testified that LeSuer never discussed with them the option of taking loans against the face value of their policies to pay premiums after the third year and that they never authorized him to do so. Although the portion of one or more of their policy application forms entitled "automatic premium loan" was checked, they testified that they had not previously known that it was checked, nor did they ever authorize LeSuer to do so. Buster testified that his application forms were filled in by LeSuer and that he then signed them. Grace testified that she signed her application forms in blank and that they were later completed by LeSuer. During discovery, Equitable produced executed

8

forms entitled "policy owner request for service" which had been submitted to Equitable for the purpose of authorizing a loan against the Nesses' policies for payment of premiums after they stopped making premium payments. However, the request forms were executed by Blaine LeSuer. The Nesses testified that they neither executed any such forms nor authorized LeSuer to execute the forms on their behalf and that they were unaware that the requests for loans against their policies had ever even been made. Officials from Equitable acknowledged that agents could execute the forms without any written authorization from their insureds and that there would have been no way for the insureds to know about the request for a loan until the following year's premium notice arrived. The same witnesses also testified that every time a loan was taken against the Nesses' policies to pay a premium, LeSuer received a commission.

Because of their assumption that premiums were due for a limited time after which the policies would be self-sustaining from dividends and earnings, the Nesses stopped paying premiums for all five whole life policies so that by the time of trial the status of the policies purchased by the Nesses was as follows:

1. The whole life policy purchased by Buster to insure Grace's life in the face amount of $25,000 in 1982 had loans against it in the amount of $4,391, which will be deducted from any life benefit payable pursuant to that policy.

2. Grace's $100,000 whole life policy was cancelled.

9

3. Buster's whole life policy, which was purchased in 1993 with a face value of $50,000, was cancelled.

4. Buster's whole life policy purchased in 1986 with a face value of $150,000 had loans against it in the amount of $29,888.

5. Buster's whole life policy purchased in 1986 with a face value of $100,000 was cancelled.

Robert Cartwright testified that as a requirement for a loan, he purchased the same term life insurance policy that Buster Ness had purchased from LeSuer and Equitable in 1982. After an unsuccessful effort to purchase his own whole life policy in 1986, he learned in 1988 that he had a right to convert his term life policy to a whole life policy. He contacted LeSuer about doing so and testified that he was told by LeSuer that he could purchase a policy which required only three payments. Based on that representation, he applied to convert his term policy in January 1988 to a variable life insurance policy. He testified that a week or two later LeSuer brought a policy to him which he rejected because it did not include language to the effect that it was a "three pay" policy. LeSuer then returned with a new document entitled "standard ledger statement whole life 50" which appears to set forth the annual net premium, net cash value, and net death benefit of a whole life policy for Robert Cartwright in the face amount of $150,000. However, on the top of the form LeSuer wrote "what I am changing you to." Under the annual loan column he put "x three pay" and under the net death benefit column he entered another "x." Cartwright testified that he accepted the document as

10

his policy and placed it in his safe. He stated that no other document was given to him.

Cartwright testified that LeSuer did not discuss the terms of the policy with him, other than to state that only three premiums would have to be paid. When the third premium notice arrived in 1990, he contacted Buster Ness who advised him for the first time that there was no such thing as a "three pay" policy. Therefore, he did not make the third payment, and in the fall of 1990 was notified by Equitable that his policy had been terminated. At the present time, Cartwright is uninsurable because of his health.

Blaine LeSuer testified that when the Nesses received premium notices for years subsequent to those in which they paid their own premiums, they contacted him and requested that he arrange to pay premiums by taking loans against their policies. He denied that he checked any portions of the policy application forms without authorization from the Nesses or that he sent in service requests without being asked to do so. He agreed that when the Nesses received premium notices they would call him and ask him to "take care of it." However, he testified that when he did take care of it by applying for loans with which to pay the premiums he was simply carrying out the terms which had been agreed to at the time the policies had been sold to the Nesses.

LeSuer testified that he had a similar agreement with Cartwright. However, he acknowledged that Cartwright rejected the first policy that was presented to him, and that in response to that rejection he presented the computer printout on which the

11

handwritten notations previously described were made. He explained the notations by stating that Cartwright was concerned about having to make more than three payments. He testified that the "three pay" notation was Cartwright's terminology and that he would have preferred to describe the policy as "self-supporting."

In his testimony, LeSuer repeatedly referred to the policies which he sold to Cartwright and the Nesses as "self-supporting," however, he explained that that meant that after three premium payments future premiums would be paid by a combination of dividends earned by the policy and loans against the policy which would be deducted from the death benefit.

The jury resolved the factual issues raised by the parties' testimony in favor of the plaintiffs when it found that Blaine LeSuer as the agent, and Equitable as his principal, breached a fiduciary duty that they owed to the plaintiffs, made negligent misrepresentations to the plaintiffs, acted negligently, committed constructive fraud, and were guilty of actual fraud. In response to a special interrogatory, the jury also found that the conduct of both defendants satisfied the factual predicate for an award of punitive damages set forth at § 27-1-221, MCA, and that punitive damages should be awarded. In its verdicts, the jury returned actual and punitive damages in the amounts previously stated. Based on its statutorily required review, the District Court then affirmed the awards of punitive damages, but reduced them by the amounts previously discussed. Further facts, as necessary, will be set forth in the context of the issues raised by the parties.

12

ISSUE 1

Were the plaintiffs' claims barred by the applicable statutes of limitations?

Buster and Grace Nesses' original complaint was filed on October 28, 1991. The amended complaint, which included Robert Cartwright's claim, was first filed on November 12, 1991. LeSuer and Equitable contend that they were entitled first to summary judgment, and then to a directed verdict dismissing all of the plaintiffs' claims based on the applicable statutes of limitations.

They contend that the three-year statute of limitations found at § 27-2-204(1), MCA, applies to the plaintiffs' claims for breach of fiduciary duty and negligence, and that the two-year statute of limitations found at § 27-2-203, MCA, applies to the claims for negligent misrepresentation and fraud. Their argument continues that the three-year statute of limitations began to run when the plaintiffs' causes of action accrued, that that occurred when all elements of their claims existed, and that all elements of the plaintiffs' claims existed when their policies were delivered in 1982, 1983, 1986, and in Cartwright's case, March 1988. They contend that the two-year statute of limitations for fraud begins to run two years from the date on which the fraud is alleged to have occurred unless by the nature of the conduct complained of, it could not have been discovered until later. However, they contend that in this case plaintiffs are charged as a matter of law with notice of any fraud perpetrated by LeSuer from the dates on which their policies were delivered, and no later than the dates on which

13

they received a notice that premiums were due in addition to those they had been led to believe they would have to pay.

The District Court agreed that plaintiffs were damaged, and therefore, that their tort causes of action accrued when they received policies which were not what they had been led to believe they would receive. The District Court also held that plaintiffs had an obligation to read their insurance contracts and that if they had done so they would have discovered the misrepresentations they alleged had been made, and therefore, that the statue of limitations for fraud also began to run on the dates on which the policies were delivered. Based on just that part of the District Court's analysis, the statutes of limitations for all claims by all plaintiffs would have expired prior to the dates on which their complaints were filed. However, the District Court went on to conclude that when the Nesses were told by LeSuer not to worry about the premium notices they received, the statute of limitations pertaining to fraud was tolled by fraudulent concealment. The District Court held that the statute pertaining to the plaintiffs' other tort causes of action was tolled by the doctrine of continuing relationship set forth by this Court in *Northern Montana Hospital v. Knight* (1991), 248 Mont. 310, 316, 811 P.2d 1276, 1279.

The District Court concluded that Cartwright's tort claims did not accrue in 1988 and that he was not put on notice of facts constituting LeSuer's misrepresentation because no policy had in fact ever been delivered to him. Instead, the court concluded that

14

Cartwright received, at most, an ambiguous document which included computer generated information cancelled by Cartwright's handwritten notations. For these reasons, the District Court denied Equitable's motion for summary judgment and the defendants' motions for a directed verdict. We will affirm the result of the District Court's decision, if correct, even though arrived at for the wrong reasons. *Norman v. City of Whitefish* (1993), 258 Mont. 26, 30, 852 P.2d 533, 535.

We conclude for the reasons that follow that the plaintiffs' complaint alleging fraud was filed on time. Since that claim was a sufficient basis for the jury's verdict, we will not address the District Court's conclusion or the issues raised by the defendants regarding the statute of limitations that applied to the plaintiffs' other tort claims.

Section 27-2-203, MCA, provides that:

The period prescribed for the commencement of an action for relief on the ground of fraud or mistake is within 2 years, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake.

Section 27-2-102, MCA, provides in relevant part that:

(3) The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if:
(a) the facts constituting the claim are by their nature concealed or self-concealing; or
(b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause.

15

Reading these statutes in combination we conclude that the statute of limitations for an action based on fraud begins when the fraud occurs unless the facts which form the basis for the allegation are, by their nature, concealed. We also conclude that even after acts which form the basis for an allegation of fraud are discovered, the statute may be tolled if the defendant takes affirmative action to prevent the injured party from discovering that he or she has been injured.

In *Holman v. Hansen* (1989), 237 Mont. 198, 203, 773 P.2d 1200, 1203, we held that "[u]nder § 27-2-203, MCA, whether there has been a 'discovery' of facts sufficient to start the running of the statute of limitations is a question of law." Without directly saying so, we impliedly held that the related question of whether there has been fraudulent concealment which would toll the statute of limitations is also a question of law. Neither party challenges this analysis on appeal. The defendants contend that as a matter of law plaintiffs' claims are barred by the applicable statutes of limitations. Plaintiffs contend that as a matter of law their complaints were filed within the allowable time. The District Court agreed. We review a District Court's conclusions of law to determine whether they are correct. *Carbon County v. Union Reserve Oil Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

The issue, then, stated another way, is when did the plaintiffs, or when should the plaintiffs have discovered that their policy was not "self-sustaining" as represented, and was

16

there fraudulent concealment by the defendant which prevented them from discovering that fact during the normal course of events.

Citing *Holman*, defendants contend that failure to discover an alleged act of fraud will not necessarily postpone the statute of limitations. In that case we held that:

> The party asserting fraud is put on inquiry notice of the other party's misdeeds, and must exercise ordinary diligence to discover the facts constituting the fraud. *Yellowstone Conference of United Methodist Church v. D.A. Davidson* (1987), [228 Mont. 288,] 741 P.2d 794; *Gregory v. City of Forsyth* (1980), 187 Mont. 132, 609 P.2d 248. Mere ignorance of the facts will not suffice to toll the statute of limitations.
>
> "He must show that the acts of fraud were committed under such circumstances that he would not be presumed to have knowledge of them, it being the rule that if he has 'notice or information of circumstances which would put him on inquiry which if followed would lead to knowledge, or that the facts were presumptively within his knowledge, he will be deemed to have actual knowledge of the facts.'"
>
> *Mobley v. Hall* (1983), 202 Mont. 227, 232, 657 P.2d 604, 607 (quoting *Kerrigan v. O'Meara* (1924), 71 Mont. 1, 8, 227 P. 819, 822).

*Holman*, 237 Mont. at 202, 773 P.2d at 1203.

Defendants contend that plaintiffs were on notice of LeSuer's alleged misrepresentations because of language in the policies that were delivered to the Nesses and the computer printout which was provided to Cartwright. The specific language they rely on indicates that premiums were due for life or for periods of time substantially in excess of three years. They also contend that the Nesses were put on notice by the annual statements they received from Equitable indicating that premiums were due in addition to those that they assumed were due and that loans were being charged

17

against their policies to pay for previous premiums which they had not paid.

We disagree with the defendants' argument and the District Court's conclusion that policy language should have placed the plaintiffs on notice that LeSuer's alleged representations were incorrect. The only notice given to the plaintiffs by either their policies or the computer printout provided to Cartwright was that premiums would be due for twenty years, thirty years, or a lifetime. However, to suggest that that information contradicted LeSuer's alleged misrepresentations misconstrues the plaintiffs' contentions which the jury found to be true. There was no allegation by the plaintiffs that LeSuer ever told them that future premiums would not be due. The dispute was over how those premiums would be paid. Plaintiffs contended that LeSuer assured them that after their first three payments (four or five payments for the 1982 and 1983 policies) the policies would earn sufficient dividends and income to pay future premiums. LeSuer contended that he told them that after three payments future premiums could be paid by a combination of dividends and loans taken against the policy. The jury resolved that conflict in the testimony in favor of the plaintiffs.

If, as the jury found, LeSuer represented to the plaintiffs that dividends and other earnings from the policy would be sufficient to pay premiums after three years (or four or five years), we conclude that there was nothing in the policy language to suggest otherwise. In fact, page three of each policy, upon

18

which defendants principally rely, specifically states that the tables listed "do not reflect dividend credits or loans." Page five provides the following information regarding dividends:

> We will determine your policy's share, if any, of our divisible surplus annually. It will be payable as a dividend at the end of each policy year if the policy is then in effect with all premiums duly paid. We do not expect any dividend to be paid on your policy before the end of the second policy year.
>
> DIVIDEND OPTIONS. You may choose one of these options:
>
> - CASH: Your dividends will be paid directly to you.
>
> - PREMIUMS: Your dividends will be used to help pay any premium then due.

(Emphasis added.) There was nothing in the policy which would have indicated to the Nesses, had they read it, that dividends would not be sufficient to pay premiums after the third, fourth, or fifth year of the policy's existence.

Therefore, we conclude that the misrepresentations which the jury found that LeSuer has made were made under such circumstances that the plaintiffs would not have known they were false, nor were they aware of facts from the language in their policy which should have put them on notice that the representations were false. Furthermore, we conclude that the first fact which should have suggested to the Nesses that LeSuer had misrepresented the terms of their policies was the notice that they received indicating premiums due beyond those they had been led to believe would be due, but that following receipt of those notices, the period of limitations was tolled annually by LeSuer's fraudulent concealment

19

when he made statements to them which were planned to prevent inquiry or the acquisition of information which would have disclosed his misrepresentations to them.

> Fraudulent concealment consists of "the employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquisition of information disclosing a cause of action." *E.W. [v. D.C.H., 231 Mont. 481]*, 754 P.2d at 821 (quoting *Monroe v. Harper*, 164 Mont. 23, 28, 518 P.2d 788, 790 (1974)). To invoke this doctrine, plaintiffs must show "affirmative conduct by the defendant calculated to obscure the existence of the cause of action." *Holman*, 773 P.2d at 1203 (citing *Yellowstone Conference of United Methodist Church v. D.A. Davidson, Inc.*, 228 Mont. 288, [294], 741 P.2d 794, 798 (1987)).

*Shupak v. New York Life Ins. Co.* (D. Mont. 1991), 780 F. Supp. 1328, 1335.

Citing *Falls Sand and Gravel Co. v. Western Concrete Co., Inc.* (D. Mont. 1967), 270 F. Supp. 495, *Holman*, 237 Mont. 198, 773 P.2d 1203, *Carlson v. Ray Geophysical Division* (1971), 156 Mont. 450, 481 P.2d 237, defendants contend that fraudulent concealment, as a matter of law, cannot consist of merely reaffirming an original misrepresentation. However, the facts in the cases relied on by the defendants are distinguishable from the facts in this case. In all three cases relied on by the defendants, the plaintiffs had discovered the facts which gave rise to their claims for fraud but were assured by the defendants that the defects or inadequate performance complained of would be cured. Under those circumstances, this Court, and the Federal District Court, held that those plaintiffs elected to rely on informal resolution of their claims and that fraudulent concealment did not occur. In this case, LeSuer was not accused of acknowledging defects in the policy that he sold to the

20

plaintiffs and then representing that the defects would be cured. He was accused of denying that any problem existed with the plaintiffs' policies for the purpose of discouraging the plaintiffs from making further inquiry. That brings his alleged conduct squarely within our prior description of fraudulent concealment.

Since neither the Nesses nor Cartwright were aware of facts which would have led them to discover LeSuer's alleged misrepresentations based on policy language, and since LeSuer fraudulently concealed the true significance of the premium notices that the Nesses received, the plaintiffs' first actual knowledge that the terms of their policies had been misrepresented was acquired in 1990. We therefore conclude that the complaint and amended complaint filed in 1991 were within the two-year period of limitation provided at § 27-2-203, MCA, and were, therefore, timely.

ISSUE 2

Did the District Court abuse its discretion when it admitted evidence that LeSuer had similarly misrepresented the terms of policies to other individuals? If not, did the District Court err by precluding further evidence of the specific manner in which those person's claims against Equitable were resolved?

During the course of their investigation and pretrial discovery, the plaintiffs learned that complaints about LeSuer's sales practices had been made by twenty-seven others to the Montana Insurance Commissioner. Complaints had also been made to Equitable's home office in New York and its regional office in

21

Fresno, California. Since LeSuer testified during discovery that he would not have applied for loans against a customer's policy without their authorization, the plaintiffs offered testimony from four other customers to prove that he had done so as a routine practice.

Audrey Kaercher, Lyle Richards, Richard Berger, and Elsie Mills all testified that they owned life insurance policies issued by Equitable when they were approached by LeSuer in the 1980s with the suggestion that they use the cash value of their existing policies to purchase newer and better policies. They all testified that LeSuer represented to them that by a combination of the value in their existing policy and a minimal number of premiums they could obtain greater coverage from a policy which would be self-supporting in a short period of time. They also testified that at the point in time when they expected their new policy to be self-supporting they continued receiving premium notices indicating that loans were being taken against their policy to pay the additional premiums, but that LeSuer had never discussed loans with them and that they had never authorized him or Equitable to loan them money for the payment of premiums. All four people testified that when they were notified of the situation, they contacted LeSuer who told them not to worry about it and that he would take care of it.

Lyle Richards and Elsie Mills testified that when they tried to contact Equitable's telephone number listed on their annual

22

premium notice, the only person either of them was ever able to reach was the janitor.

The defendants objected to testimony from these four witnesses on the grounds that it was irrelevant and inadmissible pursuant to Rules 401 and 402, M.R.Evid.; it was prejudicial pursuant to Rule 403; and their complaints lacked sufficient similarity to qualify pursuant to Rule 404(b) and the standards established in *State v. Matt* (1991), 249 Mont. 136, 814 P.2d 52, for admission of evidence of other acts. The District Court, however, admitted the testimony of these four witnesses pursuant to Rules 404(b) and 406, M.R.Evid.

We review a district court's evidentiary rulings to determine whether there has been an abuse of discretion. *In re $23,691.00* (Mont. 1995), 52 St. Rep. 1063, 1065, 905 P.2d 148, 152 (citing *State v. Passama* (1993), 261 Mont. 338, 341, 863 P.2d 378, 380). The district court has broad discretion to determine if evidence is admissible. Accordingly, absent an abuse of discretion this Court will not overturn the district court's determination. *In re $23,691.00*, 905 P.2d at 152, 52 St. Rep. at 1065.

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. <u>Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.</u>

Rule 401, M.R.Evid. (emphasis added).

> All relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state.

23

Rule 402, M.R.Evid.

Buster Ness, Grace Ness, and Robert Cartwright testified that they were told by LeSuer that they could purchase whole life insurance policies from Equitable which would be supporting after payment of a few annual premiums. They testified that loans against the policy which had the effect of reducing the policy's death benefit had never been suggested by LeSuer and were not part of the bargain. Buster and Grace also testified that when they did receive notice that loans were being taken against the policies, LeSuer told them there had been a bookkeeping or computer programming mistake, that they should not worry about it, and that he would take care of it.

LeSuer testified that he explained to all three plaintiffs that they could purchase policies from Equitable for which they would have to pay cash premiums for only three years because after that period of time premiums could be paid by a combination of dividends, policy earnings, and loans against the policy. He testified that he never requested loans against policies without the plaintiffs' authorizations, and that when they called him to request that he deal with additional premium notices, they were actually calling him to request that he secure the loans necessary to pay their additional premiums.

LeSuer, who testified by video deposition, had no specific recollection of exact conversations with Buster and Grace Ness. However, attorneys for the defendants refreshed his recollection

24

regarding his conversations with them based on documents in the company's possession.

After being shown premium notices issued to Grace Ness which showed loans taken against her policy, LeSuer testified, based on that notice, that Grace had called him and said she did not have the money for the premium and asked him to have it paid by authorizing a loan against her policy.

When shown a customer service form authorizing payment of a premium loan which had been filled out by him, LeSuer testified that Buster or Grace must have requested a loan or he would not have filled out the form. Based on LeSuer's testimony, which assumed facts because of documents that were in existence, the plaintiffs were entitled to show that similar customer service forms or notices of loan payments to pay premiums which existed among the records of other customers did not automatically establish approval by that customer for loans against their policies.

If similar notices were sent to other customers and similar customer service forms were filled out on behalf of other customers without any request by them that LeSuer do so, those facts made LeSuer's reconstruction of events, based on the documents pertaining to the Nesses' policies, less credible. Therefore, we conclude that the testimony of Kaercher, Richards, Berger, and Mills was relevant and admissible, absent some other basis in the Rules of Evidence for excluding it.

25

The defendants contend that pursuant to Rule 404(b), M.R.Evid., the evidence of prior acts and representations by LeSuer was inadmissible character evidence. Rule 404(b) provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence or mistake or accident.

We have not previously applied or discussed Rule 404(b) in the context of a civil action, however, because defendants' contention is not that the Rule should not have been applied, but rather that it was misapplied, its applicability is not before us. We have stated in the context of criminal law that certain criteria must be considered before prior bad acts can be admitted without offending Rule 404(b). In *State v. Matt* (1991), 249 Mont. 136, 142, 814 P.2d 52, 56, we held that: (1) the other acts must be similar; (2) the other acts must not be remote in time; (3) the other acts may be admitted for one of the permissible purposes provided in Rule 404(b); and (4) the probative value of the other act must not be outweighed by the danger of unfair prejudice.

LeSuer contends that the first of the four criteria set forth above is not satisfied in this case because the nature of LeSuer's alleged representations to these four witnesses was different than his alleged representations to the plaintiffs. He distinguishes the representations to the other four witnesses on the basis that they had existing policies which were being used to partially fund

26

premiums for new policies. However, we conclude that the distinction is insignificant.

The basic conduct which the testimony was offered to prove is the same. All four witnesses claimed that they were told they could purchase a better policy for a minimal number of premiums, that the policies would become self-supporting, and that after a few years they would owe no further premiums from their own personal funds. When instead they received notices of additional premiums which were being paid by loans against the policies, they contacted LeSuer who told them that the notices were a mistake, they should be ignored, and that he would take care of the problem. All of the witnesses testified that loans to pay premiums were never explained to them or discussed with them and that they had not given authorization to LeSuer to apply for loans against their policies. In all significant respects, the misrepresentations they described and the pattern of conduct they complained of were identical to those misrepresentations and the pattern of conduct complained of by the plaintiffs. Therefore, we conclude that the acts to which the four witnesses testified were sufficiently similar to those which were the subject of the plaintiffs' complaint. We furthermore conclude that the acts about which these four witnesses complained occurred during the approximate time of the acts complained of by the plaintiffs; they were probative of LeSuer's plan to earn commissions by selling policies to customers which they would have known they could not afford had the policies been honestly explained to them, and further probative of the fact

27

that the problems complained of by the plaintiffs were not the result of a mistake or miscommunication on LeSuer's part. Finally, we conclude that the probative value of the offered evidence substantially outweighed the danger of unfair prejudice, and therefore, that the evidence was admissible pursuant to Rule 404(b), M.R.Evid.

After the testimony of these four witnesses was admitted, the District Court allowed defendants' counsel to ask on cross-examination whether their complaints about the way in which LeSuer handled their policies had been satisfactorily resolved. They all answered that their claims had been resolved. However, defendants were not allowed to further explore the specific details of each resolution. The District Court limited cross-examination to that extent for the stated purpose of avoiding other trials within the trial of this case.

On appeal, LeSuer complains that the jury was left with incomplete information and that in fairness, he should have been allowed to explore completely the manner in which each of the four claims was resolved. We conclude, however, that the manner in which each of the four claims was resolved is irrelevant. The plaintiffs were entitled to corroborate their own testimony and impeach LeSuer's testimony by establishing LeSuer's pattern of conduct. The defendants were entitled to show that when LeSuer's conduct was brought to Equitable's attention, it took measures to cure the problems that he created. However, the particular manner in which the problems were resolved had no bearing on any issue in

28

this case. Therefore, we conclude that the District Court did not abuse its discretion by limiting the cross-examination of these four witnesses in the manner described.

## ISSUE 3

Was the jury's finding that the defendants committed fraud supported by substantial evidence?

Defendant LeSuer argues on appeal that there was insufficient evidence to sustain the jury's verdict that the defendants defrauded the plaintiffs.

We review a jury's factual findings to determine whether there is substantial evidence in the record to support those findings. *Hogan v. Flathead Health Ctr., Inc.* (1992), 255 Mont. 388, 390, 842 P.2d 335, 337. As we stated in *Cechovic v. Hardin & Associates* (Mont. 1995), 902 P.2d 520, 525, 52 St. Rep. 854, 848:

> This Court's role is not to agree or disagree with a jury's verdict. Once we conclude that substantial evidence supports the verdict, our inquiry is complete. Substantial evidence has been defined as evidence a reasonable mind might accept as true and can be based on weak and conflicting evidence. When we determine whether substantial evidence supports the jury's verdict, we review the evidence in a light most favorable to the party who prevailed at trial. If the evidence at the trial conflicts, the jury's role is to determine the weight and credibility of the evidence.

(Citations omitted.)

We have previously held that in a civil action for fraud it is necessary to establish the following nine elements:

The nine elements of fraud are:

1. A representation;

29

2.  Falsity of the representation;

3.  Materiality of the representation;

4.  The speaker's knowledge of the falsity of the representation or ignorance of its truth;

5.  The speaker's intent that the representation shall be relied upon;

6.  The hearer's ignorance of the falsity of the representation;

7.  The hearer's reliance on the representation;

8.  The hearer's right to rely upon the representation;

9.  Consequent and proximate injury caused by the reliance on the representation.

*Northwest Truck & Trailer Sales v. Dvorak* (1994), 269 Mont. 150, 154, 887 P.2d 260, 262 (quoting *Wiberg v. 17 Bar, Inc.* (1990), 241 Mont. 490, 496, 788 P.2d 292, 295).

The jury was properly instructed on the elements that plaintiffs had to prove to establish fraud. LeSuer does not claim otherwise. What he does contend is that because of the policies which were provided to the plaintiffs, and the language in those policies which indicated the number of premiums which were due, plaintiffs were not justified in relying on LeSuer's alleged misrepresentations that the policies would be self-supporting after three, four, or five premium payments. However, for the reasons stated in our discussion of Issue 1, we repeat that the dispute in this case was not about the number of premiums due for the policies sold by LeSuer, or about the length of time over which premiums would have to be paid. The dispute was whether LeSuer represented

that premiums after the first few would be paid by dividends and policy earnings, or whether he advised plaintiffs that in fact future premiums would have to be paid by them personally or paid by loans taken against the policy. As we have previously noted, there was nothing in the policy language which would have informed the plaintiffs one way or the other. Therefore, there was nothing about the policy language which would have precluded plaintiffs as a matter of law from relying on LeSuer's representations.

For these reasons, and based on the testimony of Buster Ness, Grace Ness, and Robert Cartwright, we conclude that there was substantial evidence in support of each of the elements of a civil claim for fraud. We therefore affirm the jury's verdict that the defendants committed fraud.

ISSUE 4

Was the jury's award of actual damages supported by substantial evidence?

Defendant LeSuer contends that there was insufficient evidence to sustain the jury's verdict that the plaintiffs incurred actual damage as a result of LeSuer's alleged misrepresentations. We review a jury's damage award as we do its determination of liability, to determine whether it is supported by substantial evidence. *Lee v. Kane* (1995), 270 Mont. 505, 510, 893 P.2d 854, 857.

LeSuer contends that because neither Cartwright nor the Nesses could afford to continue making premium payments on the term policies that they purchased in 1982, that their options were very limited and that the only thing they have lost based on any

31

misrepresentation made by him are the premium payments that they made toward the whole life policies to which their term policies were converted.

Our review of the record establishes that the jury's compensatory damage awards were based on the testimony of Darby Minnick. Mr. Minnick is a life insurance agent with Northwestern Mutual Life in Bozeman and has been in the business for fifteen years. He expressed the opinion after reviewing the plaintiffs' policies that they had suffered economic loss based on their purchases from Equitable and gave the following opinions regarding the extent of damages that the plaintiffs' sustained.

Minnick expressed the opinion that Cartwright's damages were based upon his agreement to purchase whole life coverage with a face value of $150,000 for three premium payments and the fact that after making two premium payments he discovered that he had not received what he had purchased, stopped making payments, and his policy was terminated. He testified that not only is Cartwright now without his term life coverage, but he has no whole life policy and he is uninsurable due to his health and age. After deducting the premium payments that Cartwright agreed to pay from the amount of coverage Equitable agreed to provide, he calculated that Cartwright's damage is $144,025. That was the amount awarded by the jury.

He testified that Grace Ness purchased coverage in the face amount of $25,000 in 1982 and that as of April 13, 1994, the policy should have provided coverage worth $27,114, but that loans against

32

that policy reduced her death benefit to $22,723. He stated that her damage related to the 1982 policy, therefore, was $4,391. He also testified that had loans not been taken against that policy, there would currently be sufficient dividends accumulated to pay premiums from this point forward.

Minnick also testified that the $100,000 whole life policy which Grace purchased in 1986 was terminated on November 18, 1994, due to failure to pay the premium and that the cost of buying that much coverage for a person of her age and paying premiums until the policy was self-supporting, based on a given rate of return, was $40,384. The jury returned a verdict of compensatory damage to Grace Ness in the amount of $44,738.

Minnick testified that at the time of trial, loans in the amount of $29,888 had been taken against Buster's $150,000 whole life policy and that to purchase a policy which would provide the coverage which had been represented to him at the price he had been told he would have to pay, those loans would have to be paid back and an additional $10,632 worth of premium payments would have to be made. To replace the $50,000 policy which he purchased in 1983 but which has been terminated or cancelled for failure to pay premiums, and to provide for the extent of coverage represented without the necessity for payment of future premiums, would cost $34,313. He added that to replace Buster's $100,000 whole life policy purchased in 1986 with a policy that would provide the amount of coverage represented at the cost represented, would cost between $57,166 and $81,848, depending on the rate of return that

33

the policy earned.  The jury returned a verdict for Buster in the amount of $144,025.

We conclude that based on the testimony of Darby Minnick, there was substantial evidence to support the jury's compensatory damage award.

## ISSUE 5

Did the District Court abuse its discretion when it refused to instruct the jury that plaintiffs could not recover for fraud in light of their failure to examine the insurance policies they purchased?

Defendant LeSuer's proposed Instruction No. 17 was as follows: "A person who fails to take the opportunity to examine a written form before executing it cannot claim fraud."  That instruction was rejected by the District Court.

LeSuer claims that his proposed instruction was supported by the evidence because the plaintiffs claimed that they signed applications for insurance which were later filled in by LeSuer and that the instruction is justified by our decision in *Montana Bank v. Lightfield* (1989), 237 Mont. 41, 771 P.2d 571.

We have held that a district court has discretion regarding the instructions it gives or refuses to give to a jury and that we will not reverse a district court on the basis of its instructions absent an abuse of discretion.  *Cechovic v. Hardin & Assoc.* (Mont. 1995), 902 P.2d 520, 527, 52 St. Rep. 854, 860.  When we examine whether jury instructions were properly given or refused, we consider the

34

instructions in their entirety, as well as in connection with the other instructions given and the evidence at trial. *Story v. City of Bozeman* (1993), 259 Mont. 207, 222, 856 P.2d 202, 211. While LeSuer's proposed Instruction No. 17 accurately paraphrased a portion of our discussion in *Montana Bank*, the instruction was incomplete and taken out of context. The entire paragraph from which the instruction was drafted is as follows:

> Typically, a person who fails to take the opportunity to examine a written form before executing it cannot claim fraud. *Jenkins v. Hillard* (1982), 199 Mont. 1, 6, 647 P.2d 354, 357; *Hjermstad v. Barkuloo* (1954), 128 Mont. 88, 98, 270 P.2d 1112, 1117. As noted by the Bank, however, a person may claim fraud to a document he signs "where he is prevented from reading it or having it read to him by some fraud, trick, artifice, or devise by the other party." 17 Am. Jur. 2d *Contracts* § 152 (1964).

*Montana Bank*, 237 Mont. at 47-48, 771 P.2d at 576.

In this case, Buster and Grace Ness testified that they were asked to sign application forms for insurance at a time when the forms did not include representations or requests which appeared on the forms as they were submitted to Equitable. The inference was that the information was added by LeSuer after the documents were executed by the Nesses. Based on the testimony given, the instruction proposed by LeSuer was an incomplete statement of the law and would have been misleading. If the jury was going to be instructed on the plaintiffs' obligation to examine the documents they signed, the jury should also have been instructed that the obligation did not apply where, because of artifice on the part of the other party, they did not have an opportunity to observe the

35

objectionable part of the document. For these reasons, we conclude that the District Court did not abuse its discretion, and therefore, did not err when it refused LeSuer's proposed Instruction No. 17.

ISSUE 6

Was there substantial evidence to support an award of punitive damages against each defendant?

Section 27-1-220, MCA, provides that punitive damages, in addition to compensatory damages, may be awarded by a judge or jury for the sake of punishing a defendant. Section 27-1-221, MCA, limits awards of punitive damages to those situations in which a defendant has been found guilty of actual fraud or actual malice. The same statute defines actual malice as follows:

> (2) A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221, MCA.

Section 27-1-221, MCA, defines the type of fraud which will support an award of punitive damages as follows:

> (3) A defendant is guilty of actual fraud if he:
> (a) makes a representation with knowledge of its falsity; or
> (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury.
> (4) Actual fraud exists only when the plaintiff has a right to rely upon the representation of the defendant and suffers injury as a result of that reliance.

36

Subparagraph (5) of § 27-1-221, MCA, provides that all elements of a claim for punitive damages must be proven by clear and convincing evidence and defines clear and convincing evidence as "more than a preponderance of evidence but less than beyond a reasonable doubt."

As stated previously, we review a jury's findings in civil cases to determine whether there was substantial evidence to support those findings. *Hogan*, 255 Mont. at 390, 842 P.2d at 337. That standard of review, however, is normally applied to the situation where the burden of proof is satisfied by a preponderance of the evidence. In criminal cases, where guilt must be proven beyond a reasonable doubt, our standard of review is specific to that burden. *See State v. Gould* (Mont. 1995), 902 P.2d 532, 541, 52 St. Rep. 930, 935-36. We have not previously analyzed whether actions which must be proven by clear and convincing evidence should be reviewed by something more than substantial credible evidence. However, we have upheld jury verdicts which awarded punitive damages where those verdicts were supported by substantial evidence. *King v. Zimmerman* (1994), 266 Mont. 54, 64, 878 P.2d 895, 901-02; *Dees v. American Nat'l Fire Ins. Co.* (1993), 260 Mont. 431, 444, 861 P.2d 141, 149. Furthermore, when we have reviewed district court decisions to terminate parental rights, which must also be based on clear and convincing evidence, we have also applied the substantial evidence standard of review. *See, e.g., In re S.C.* (1994), 264 Mont. 24, 28, 869 P.2d 266, 268; *In re F.M.* (1991), 248 Mont. 358, 363, 811 P.2d

37

1263, 1266. We therefore review the jury's verdict in this case to determine whether there was substantial evidence to support its determination that plaintiffs were entitled to recover punitive damages.

The jury was instructed on the law of punitive damages and neither defendant objects on appeal to the manner in which the jury was instructed on that subject. Based on those instructions, the jury responded in the affirmative when asked by special interrogatory whether punitive damages should be awarded against each defendant. However, both defendants contend on appeal, for different reasons, that there was insufficient evidence to support that part of the jury's verdict.

LeSuer contends that because the District Court should not have admitted evidence of complaints by people other than the plaintiffs, the only evidence offered in support of the plaintiffs' claim for punitive damages was their own testimony; and that since there were inconsistencies in the plaintiffs' testimony, substantial doubt was raised about their credibility, and therefore, the evidence against LeSuer was not clear and convincing. Based on our review of the record, we disagree.

LeSuer, himself, corroborated the plaintiffs' testimony in many particulars. He agreed that he told them they would only have to pay three premiums from their personal funds for whole life insurance policies. He agreed that he described the policies to them as "self-supporting." He agreed that when they called him to advise him of the premium notices they had received, he told them

38

he would take care of the problem. LeSuer's testimony differs from the plaintiffs only because he testified that to him "self-supporting" meant that future premiums would be paid by a combination of dividends, policy earnings, and loans against the policy, and in the further respect that when he told them he would take care of the premiums the understanding was that he would take care of them by obtaining loans from Equitable.

Furthermore, as discussed previously in this opinion, the plaintiffs' testimony, although substantial evidence, does not stand alone. Four other individuals testified that when LeSuer sold policies to them which he described as "self-supporting" he did not discuss loans to pay future premiums and did not obtain their authorization to borrow money against their policies. These same people testified that when they complained of premium notices which they had not expected to pay, LeSuer clearly conveyed to them that the premium notices were the result of a clerical error.

Lyn Gunning sold life insurance for Equitable in Great Falls from 1969 until 1976. He worked for the same company in Billings until 1978, and has been the office manager for Equitable's Denver agency since 1986. When he took over the Denver agency in 1986 it was responsible for the entire state of Colorado. However, in 1990, that same agency assumed responsibility for the states of Wyoming and Montana as well. At that time, he began reviewing complaints that LeSuer had sold life insurance policies by misrepresenting the actual cost of those policies to his customers. In the course of his investigation of those complaints, he prepared

39

a number of memos setting forth his findings. In a note dated February 24, 1992, related to a complaint by Janet Breedan, he referred to Don Blumer (LeSuer's former supervisor), Joe Wanago (another Great Falls salesperson), and Blaine LeSuer by stating, "they are all part of that mess up in Montana." He explained that the mess he referred to was a series of complaints involving LeSuer.

In a July 26, 1990, memo regarding the complaint filed by Lloyd Kaercher, after Gunning had been involved in a high number of complaints about LeSuer for several months he stated, "attached is correspondence relating to another policy holder being raped by Blaine LeSuer."

Gunning testified that during the course of his investigations of LeSuer he developed no evidence which would refute any of the complaints that he had received about LeSuer. Neither did he have any evidence to suggest that there was any basis for refuting the claims made by Cartwright and the Nesses. He testified that after reviewing complaints against LeSuer he concluded that it was LeSuer's common practice to take unauthorized loans against policy holders policies, and when they were notified to tell them not to worry about it because he would take care of it. It was his opinion that LeSuer had engaged in a regular practice of destroying the value of people's life insurance in order to sell them more life insurance.

We conclude that the evidence that LeSuer engaged in fraudulent and malicious conduct within the meaning of § 27-1-221,

40

MCA, was supported by substantial credible evidence and that the evidence was clear and convincing. The jury's verdict to that effect is affirmed.

Equitable challenges the jury's finding that it is liable for punitive damages on a different basis. It contends that the undisputed evidence was that LeSuer was a rogue agent who broke the company's rules by acting dishonestly, and that as a matter of law, based on the proof in this case, it is not vicariously liable for punitive damages based on his conduct.

Equitable argues that the circumstances which will support an award of punitive damages against a principle are set forth in Restatement (Second) of Torts § 909, and that those circumstances were not proven in this case. Section 909 provides as follows:

> Punitive damages can properly be awarded against a master or other principle because of an act by an agent if, but only if,
> (a) The principle or a managerial agent authorized the doing and the manner of the act, or
> (b) The agent was unfit and the principle or a managerial agent was reckless in employing or retaining him, or
> (c) The agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) The principle or a managerial agent of the principle ratified or approved the act.

Restatement (Second) of Torts § 909 (1979).

With the exception of a minor change to subparagraph (d), which in fact increased the burden on the plaintiff, the jury was instructed that § 909 is the law in Montana. Neither party objected to this instruction. Therefore, while we express no opinion that § 909 does or does not state the law in Montana

41

regarding the liability of a principle for punitive damages based on the acts of an agent, we will review the evidence as it relates to the law as it was given to the jury.

Equitable's administrative structure consisted of a home office in New York, four regional offices at various locations in the country, and agency offices covering a smaller geographical areas which included various districts. When LeSuer began selling insurance for Equitable, he worked for an agency office located in Billings, but his district office was located in Great Falls.

Joseph Wanago testified that he is a retired insurance broker who sold policies for Equitable from 1961 to 1987. He was the district manager in Great Falls from 1962 until about 1975. He testified that he resigned the managerial position in 1975 after he complained to the new office manager about the exploitation of customers and was told to mind his own business.

He testified that he recalled LeSuer's customers calling the Great Falls office to inquire about why they had loans taken against their policies. He testified that when he advised them they must have authorized it, they disagreed with him. He recalled referring five to ten such people to Equitable's regional office in Fresno to resolve their problems.

Wanago explained that when he first became alerted to the fact that LeSuer was misleading customers about the nature of coverage they were purchasing and then borrowing money against their policies without their authorization, he reported the fact to Don Blumer, the new district manager, who told him to mind his own

42

business. Eventually he reported the problem to Bud Partridge, the agency manager in Billings, who responded by getting mad at him, telling him it was none of his business, and explaining that the theory by which they operated was "buyer beware." He described LeSuer's sales practices and Blumer's tacit approval of those practices as "wrong and unethical."

He explained that LeSuer and other agents were telling people they could buy life insurance for nothing when what they were actually doing was tapping an existing policy which eventually became worthless, or borrowing money against the new policy which diminished the value of that policy, and that in the process agents like LeSuer made huge commissions.

Wanago testified that in addition to the customers who he personally referred to the regional office in Fresno, he also personally made complaints to regional officials and to two different presidents of the company.

Carol Ann Matthew testified that beginning in 1975 she worked for Equitable's customer relations department in New York where she corresponded with customers about their complaints. She also served on a sales resolution committee which investigated and handled complaints. She first received complaints about LeSuer which were similar to the complaints in this case in 1984, handled additional complaints in 1985 and 1986, and a final complaint in 1990. However, she testified that no disciplinary action was taken against LeSuer as a result of any of these complaints.

43

Ken Tarrant testified that he became the staff manager at the Fresno regional office for Equitable in 1990. Among his responsibilities, he handled customer complaints related to sales practices. By then there were at least twenty complaints filed against LeSuer involving loans against policies, and each of them involved an unauthorized loan for which LeSuer signed the customer request form. He admitted that during the time involved there was nothing in the policies provided to the insureds which informed them that an agent could take out loans against their policy without their approval or written authorization, and that during the time that the conduct complained of in this case occurred customers would not even be provided notice that a loan was made until the following year's premium notice was received.

John Doherty was appointed agency manager for the Wyoming agency in 1979. Responsibility for Montana was added to his duties in 1985. Although Equitable had 22,000 policy holders in Montana who owned $400,000,000 worth of life insurance, the company concluded it was not feasible for the state to have its own agency manager.

Doherty testified that because of the distance he was located from Montana, he did not have frequent communication with LeSuer, but he was aware from the agency's records that from 1985 to 1987 LeSuer was selling "leveraged policies." However, he had not been advised of the complaints made against LeSuer with other offices until they were brought to his attention by the plaintiffs' attorneys.

44

He stated that LeSuer was terminated as an agent in 1989, but not because of sales practices which Doherty described as "fraudulent." LeSuer was finally terminated by Equitable for lack of production.

There was additional evidence that managerial agents for Equitable were aware of LeSuer's dishonest sales practices, but did nothing to prevent them from being repeated. In the interest of avoiding repetition, we will not set forth all of the evidence in this opinion.

In determining whether there is sufficient evidence to support a jury's verdict, we review the evidence in the light most favorable to the party which prevailed. The prevailing party is also entitled to any reasonable inference that can be drawn from the facts which are proven. *Silvis v. Hobbs* (1992), 251 Mont. 407, 411, 824 P.2d 1013, 1015; *see Jacques v. Montana Nat'l Guard* (1982), 199 Mont. 493, 504, 649 P.2d 1319, 1325. Applying that standard of review to the evidence that has been described, we conclude that there was clear and convincing evidence from which a jury could find that both subparagraphs (b) and (d) of § 909 were proven in this case. Conduct by LeSuer, which was described by his own coworkers as unethical, and by his managerial personnel as fraudulent, was reported repeatedly to his supervisors and to high executive officers of Equitable. In spite of those reports, he was retained by the company. Furthermore, it can be inferred from the testimony that LeSuer's supervisors or managerial agents approved of his

45

conduct. LeSuer testified himself that when he was supervised by Blumer, Blumer frequently made disparaging remarks about customers, such as "piss on 'em." He also testified that when he reported similar dishonest sales practices by another agent, he was told by Blumer not to worry about it. Finally, he testified that his practice of financing new policies by a combination of dumping old policies and borrowing money on behalf of the client was never criticized by Equitable officials in Billings, Cheyenne, Fresno, or New York.

For these reasons, we conclude that the evidence that plaintiffs were entitled to recover punitive damages against LeSuer and Equitable was supported by substantial credible evidence and that the evidence was clear and convincing. The jury's verdict to that effect is affirmed.

## ISSUE 7

Should the plaintiffs' compensatory damage awards be reduced by a percentage equal to the degree to which the jury found that each plaintiff was contributorily negligent?

After the entry of judgment in favor of the plaintiffs, LeSuer and Equitable moved the court to amend the judgment by reducing the actual damages awarded to the plaintiffs by the percentages of their contributory fault. That motion was denied by the District Court.

As authority for their contention that plaintiffs' damages should be reduced by the percentage of their contributory

46

negligence, the defendants rely on § 27-1-702, MCA, which provides as follows:

> Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or injury to person or property if such negligence was not greater than the negligence of the person or the combined negligence of all persons against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering.

(Emphasis added.)

The plaintiffs respond that § 27-1-702, MCA, clearly authorizes reduction of damage awards based on contributory negligence only to the extent that the defendants' liability is also based on negligence. They contend that since, in this case, all of their actual damages were independently caused by the defendants' fraud, there is no basis for reducing their recovery pursuant to the comparative negligence statute.

The defendants contend, however, that the plaintiffs' negligence can be compared to the defendants' fraudulent conduct for purposes of reducing their recovery pursuant to our prior decisions in *Martel v. Montana Power Co.* (1988), 231 Mont. 96, 752 P.2d 140, *Drilcon, Inc. v. Roil Energy Corp.* (1988), 230 Mont. 166, 749 P.2d 1058, and *Evans v. Teakettle Realty* (1987), 226 Mont. 363, 736 P.2d 472. For the following reasons, we conclude that the cases relied on by the defendants are inapplicable to the facts established in this case.

In *Evans*, the plaintiffs alleged that they purchased an uninhabitable home as a result of the defendant realtor's

47

negligence and violation of the Montana Consumer Protection Act (§§ 30-14-101 -142, MCA). The defendant alleged that the plaintiffs' contributory negligence caused their own damages. After trial, a jury found that the defendant violated the Consumer Protection Act, that each party was fifty percent at fault based on negligence principles, and that the plaintiffs' damages were $28,000. *Evans*, 226 Mont. at 364-65, 736 P.2d at 473. The verdict did not specify what amount of those damages was attributable to the violation of the Consumer Protection Act, as opposed to the parties' negligence. The district court allowed reduction of the plaintiffs' damages by fifty percent. On appeal the plaintiffs contended that the district court erred when it compared their negligence to the defendant's Consumer Protection Act violation for purposes of reducing their recovery. *Evans*, 226 Mont. at 365, 736 P.2d at 473. In affirming the district court, we noted that based on the instructions given to the jury, damages for violation of the Consumer Protection Act were different than the damages recoverable for negligence, but that based on the jury's verdict there was no way for us to determine what amount of the total damages were awarded for each cause of action. Therefore, based on the *inadequacy of the record, we affirmed the district court. Evans,* 226 Mont. at 366, 736 P.2d at 473-74. In dissent, Justice Sheehy noted that the instructions given to the jury, as interpreted by the special verdict, were so confusing, that the entire case should have been retried. *Evans*, 226 Mont. at 367, 736 P.2d at 474.

48

*Evans* has no application to the facts in this case. The plaintiffs in this case recovered damages based on five independent causes of action and the damage instruction was the same for each cause of action. Therefore, it was not necessary for the district court to reduce the plaintiffs' damages based on confusion about which damages were attributable to the defendant's negligence, as opposed to the defendant's fraudulent conduct.

In *Drilcon*, the issue was not whether a plaintiff's contributory negligence could be compared to a defendant's fraudulent or intentional conduct. The issue raised by the defendant on appeal was whether a jury verdict form which allowed the jury to consider the defendant's negligence, as well as fraudulent conduct by third parties when it apportioned liability, was unduly confusing in light of the defendant's contention that the third parties' fraudulent conduct was an intervening and superseding cause of the plaintiff's damages. However, since the jury actually found that the defendant was ninety-five percent negligent and the plaintiff was five percent contributorily negligent, we held that the defendant was not prejudiced by the form of the special verdict. Since there was no prejudice, we concluded there was no cause for reversal based on the district court's verdict form. *Drilcon*, 230 Mont. at 173, 749 P.2d at 1062. *Drilcon* clearly has no relevance to the issue raised by the defendants on appeal.

In *Martel*, the plaintiff suffered permanent injuries when he was electrocuted after coming in close proximity to the defendant's

49

electric power transmission line. *Martel*, 231 Mont. at 98, 752 P.2d at 142. He alleged, and the trial court concluded, that he had proven willful and wanton conduct on the part of the defendant which contributed to the cause of his injuries. However, the district court allowed the jury to compare the plaintiff's negligent conduct to the defendant's conduct for the purposes of apportioning liability. On appeal, the plaintiff contended that based on our prior decisions negligence could not be compared to willful and wanton misconduct. We noted that the rule relied on by the plaintiff preceded the enactment of comparative negligence in Montana and reversed that rule. *Martel*, 231 Mont. at 99-100, 752 P.2d at 142-43. We held that:

> [A]ll forms of conduct amounting to negligence in any form including but not limited to ordinary negligence, gross negligence, willful negligence, wanton misconduct, reckless conduct, and heedless conduct, are to be compared with any <u>conduct that falls short of conduct intended to cause injury or damage</u>.

*Martel*, 231 Mont. at 100, 752 P.2d at 143 (emphasis added).

As is evident from the quoted portion of *Martel*, we did not hold that a plaintiff's negligence could be compared to conduct by a defendant which was intended to cause harm for purposes of reducing the plaintiff's recovery pursuant to § 27-1-702, MCA.

In this case, the jury found that plaintiffs were entitled to recover punitive damages based on instructions which required that they first find that misrepresentations were made for the purpose of causing damage to the plaintiff. Therefore, based on the jury's finding, and based on the plain language of the comparative

50

negligence statute and our application of that statute in *Martel*, we conclude that the defendants' fraudulent conduct is not a form of negligence to which the plaintiffs' negligence can be compared for the purpose of diminishing the plaintiffs' recovery of actual damages.

For these reasons, we affirm the District Court's order denying the defendants' motion to amend its judgment in favor of the plaintiffs.

## ISSUE 8

Did the District Court err by its award of punitive damages made pursuant to § 27-1-221, MCA?

Although liability for punitive damages must first be determined by the trier of fact which in this case was the jury, and although the jury has the responsibility for, in the first instance, determining the appropriate amount of punitive damages, the district court must, pursuant to § 27-1-221(7)(c), MCA, review the punitive damage award based on specified criteria. Following that review, and based on its findings as applied to those criteria, the district court may increase, decrease, or affirm the jury's verdict. In this process, the district court has broad discretion. However, its discretion is not unlimited. If it decides to increase or decrease the jury verdict, its decision must be supported by the statutorily prescribed criteria, by findings of fact which are supported by substantial evidence, and by findings of fact which are not inconsistent with findings that are implicit

51

in the jury's verdict. *See DeBruycker v. Guarantee Nat'l Ins. Co.* (1994), 266 Mont. 294, 300, 880 P.2d 819, 822.

We will review the district court's findings made pursuant to § 27-1-221, MCA, based on the three-part test set forth in *Interstate Production Credit Association v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287), to determine whether they are clearly erroneous. We will review the district court's decision to reduce, increase, or affirm the jury's verdict regarding punitive damages to determine whether the district court abused its discretion. *See Dees v. American Nat'l Fire Ins. Co.* (1993), 260 Mont. 431, 449, 861 P.2d 141, 152.

All of the parties contend on appeal that the District Court erred by the amount of punitive damages it awarded pursuant to its process of statutory review.

LeSuer contends that the District Court abused its discretion by not completely setting aside that amount assessed by the jury against him. He points out that § 27-1-221(7)(a), MCA, requires that a defendant's financial condition be considered when arriving at the amount of punitive damages and that there was no evidence of his financial condition. However, there was no evidence of his financial condition because he produced none, and therefore, based on our previous holdings, LeSuer's complaint is without merit. As we recently pointed out in *Maurer v. Clausen Distributing Co.* (Mont. 1996), ____ P.2d ____, ____, 53 St. Rep. 78, 80:

> In *Gurnsey v. Conklin Co., Inc.* (1988), 230 Mont. 42, 55, 751 P.2d 151, 158, we stated a plaintiff is not required to show proof that a defendant's net worth supports an award of

52

punitive damages. If the defendant's net worth does not support an award of punitive damages, the defendant must produce evidence to that fact. *Gurnsey*, 751 P.2d at 158. Tucker [defendant] should not gain an advantage from failing to produce evidence of his net worth. Accordingly, there was no evidence that Tucker's net worth could not support a punitive damage award of $75,000, and so, the District Court erred in vacating the jury's award of punitive damages against Tucker.

For these reasons, we affirm the District Court's refusal to vacate the punitive damage award against LeSuer.

Equitable contends that the punitive damage award assessed against it by the jury should have been further reduced or set aside for the following reasons:

1. The jury verdict was a result of passion and prejudice based on appeal to local bias and should be set aside pursuant to our decision *Safeco Insurance Co. v. Ellinghouse* (1986), 223 Mont. 239, 725 P.2d 217.

2. The District Court's findings made pursuant to § 27-1-221(7), MCA, either favored Equitable or were clearly erroneous.

By cross-appeal the plaintiffs contend that pursuant to our decision in *DeBruycker* the district court is not free to substitute its judgment for that of the jury; and that based on the net worth of Equitable, and LeSuer's failure to produce any evidence of his net worth, there was no evidence that the jury's verdict was based on passion and prejudice.

Resolution of the issues raised by Equitable and the plaintiffs is more problematic than the issue raised by LeSuer and

53

requires scrutiny of the District Court's findings in light of the criteria the District Court was required to consider pursuant to statute. The following are the criteria set forth at § 27-1-221(7)(b)(i)-(ix), MCA, and a summary of the court's findings regarding each as it applied to each defendant:

*(i) The nature and reprehensibility of the defendants' wrongdoing.*

LeSuer

IV.

The nature of LeSuer's wrong was that he deliberately deceived plaintiffs and others concerning the policies they had purchased in order to secure their business and earn commissions. He wrongly advised these, and other insurance clients, concerning the manner of payment of policy premiums, which resulted in loans against the policies, reduced the amount of insurance, and in some instances terminated coverage. He acted purposely and knowingly. He first gained the trust of his clients, and then defrauded them. <u>The nature and reprehensibility of LeSuer's acts justify the amount of punitive damages awarded against him.</u>

Equitable

V.

Equitable hired LeSuer to sell its policies. LeSuer was assigned to another agent for training. The evidence showed that the training agent was engaged in highly questionable practices, and was essentially unsupervised.
. . .

VI.

. . . When another agent, with more seniority, and whose integrity was proven, complained about LeSuer's treatment of customers, such complaint was ignored. . . .

VII.

Equitable had notice that something was amiss. At least five times before he left the company complaints were received from customers. . . . No actions were taken to prevent serious harm to insureds, or to find out if other irregularities existed.

54

## VIII.

Even after Equitable had more than adequate notice of the problems with LeSuer, nothing was done. . . . Even though the amount of business Equitable conducted in Montana was substantial, policies here were a very small percentage of the total business, and the territory was substantially ignored by management.

## IX.

. . . [Its] policy of urging customers to trust and rely on agents, combined with lack of supervision of the agents, and failure to make any serious attempt at investigation of known complaints, is truly reprehensible conduct. <u>Such conduct, in conjunction with the remaining facts found by the Court, justifies the amount of punitive damages awarded by the jury.</u>

(Emphasis added.)

### *(ii) The extent of the defendants' wrongdoing.*

### LeSuer

## X.

LeSuer not only defrauded plaintiffs here, but many others, as evidenced by the number of complaints that have come to light. It is very probable that he either did, or was willing to, lie to all of his customers. LeSuer's wrongdoing was as widespread and extensive as his service area.

### Equitable

## XI.

. . . It is also apparent that Equitable handled complaints from insureds all over the United States in its New York office. These complaints were not looked at with protection of an insured in mind, but rather from the standpoint of how to protect the company. The evidence at trial was clear and convincing that while Equitable courted the public by posing as a caring, even paternal, company, it put its own interests above the interests of its insureds.

The Court recognizes that it would be next to impossible for these, or any, plaintiffs to examine the records of a substantial portion of Equitable's thousands

of agents to find such fraud.  However, with the lack of such evidence the culpability of Equitable is somewhat mitigated.

*(iii)  The intent of the defendants in committing the wrong.*

<u>LeSuer</u>

XII.

LeSuer's intent in committing the wrong was not directly to harm the plaintiffs, or the others he lied to.  His intent was to switch insurance policies, or sell new policies, so that he could earn commissions.  He obviously did not care what the effect on the insured's would be, he just wanted his commissions.  He obviously knew what he was doing, and cared not about his clients.

<u>Equitable</u>

XIII.

Equitable's intent, as it affected plaintiffs' claims, was to concentrate it resources in those areas of sales and investments which generated profit, and to pay insufficient attention to internal controls that protected its insureds.

.  .  .  <u>Equitable's willingness to sacrifice its insureds' best interests to increase profits easily justifies the amount of punitive damages.</u>

(Emphasis added.)

*(iv)  The profitability of the defendants' wrongdoing, if applicable.*

<u>LeSuer</u>

XIV.

LeSuer profited from the fraudulent sales to plaintiffs and to other customers.  He earned greater commissions on the sale of new policies, and earned renewal commissions.  .  .  .

<u>Equitable</u>

XV.

Equitable profited from the sales of the policies to the plaintiffs.  It also profited from other misrepresentations by LeSuer.  .  .  .

56

*(v)   The amount of actual damages awarded by the jury.*

<u>LeSuer and Equitable</u>

XVI.

The amount of actual damages awarded, \$358,591.00, is substantial.  Also, it is everything that plaintiffs prayed for.  It is doubtful that LeSuer will be able to make a substantial contribution to satisfaction of the judgment for actual damages.  Based on the evidence, it is just as doubtful that payment of the full amount of such damages would begin to be enough to impress upon Equitable the extent of its wrongdoing.

*(vi)   The defendants' net worth.*

<u>LeSuer</u>

XVII.

LeSuer's net worth is unknown.  He chose not to give evidence concerning his assets.  It is known that he is physically ill and that he is retired.  <u>His actions, leading to the award of actual damages, justify the award of punitive damages.</u>

<u>Equitable</u>

XVIII.

Equitable's net worth in 1993 was \$1,832,462,923.00.  Equitable introduced no evidence of a change.  The jury's award, while substantial, is hopefully enough to make Equitable examine its policies, but will not affect the solvency of the company, or endanger its ability to perform its insurance contracts.  Reserves are shown by Equitable's financial statement to be sufficient, after payment of the verdict here, to protect policy holders.

The net worth of Equitable makes it apparent that an award of punitive damages must be substantial to be effective.

(Emphasis added.)

*(vii)   Previous awards of punitive damages against the defendants based on the same wrongful act.*

57

<u>LeSuer and Equitable</u>

## XIX.

The evidence does not reveal any previous awards of exemplary or punitive damages against either LeSuer or Equitable. Thus, there is no showing that either defendant would be punished more than once for conduct such as that proved in this case.

*(viii)* *Potential or prior criminal sanctions against the defendants based on the same*

*wrongful act.*

<u>LeSuer</u>

## XX.

While it might be possible to prosecute LeSuer for criminal fraud, it is very unlikely that such will happen, and the statute of limitations has probably run if criminal proceedings were contemplated.

<u>Equitable</u>

## XXI.

Criminal action against Equitable is not a viable remedy. Its corporate nature would make punishment via the criminal statutes virtually impossible. Punitive damages are the only practical way of making an example of Equitable and deterring the conduct found malicious and fraudulent here.

*(ix)* *Any other circumstances.*

## XXII.

The jury in this case was conservative by nature, listened carefully to the evidence, and gave no indication that they acted out of passion or prejudice. The jury did not act out of ignorance. They considered the evidence and coolly decided that punishment should be 1½% of Equitable's net profit for 1993. [$408,523,011] The jury was convinced, as is the Court, that a sizable award of punitive damages against both defendants is both warranted and necessary.

The District Court also found that while LeSuer no longer sold insurance and did not need to be deterred from further fraudulent conduct, it was necessary to make an example of him in order to deter others from acting similarly, but that his retirement and lack of knowledge concerning his net worth tended to reduce the amount of the award. The court also found that as far as Equitable was concerned, the jury's verdict was rationally based, was not the result of passion and prejudice, was necessary to get Equitable's attention, and that "[t]he very size of the punitive damage award against Equitable is not a circumstance that operates to either increase or reduce the amount." The court decided though that because the full magnitude of LeSuer's wrongdoing was not known until after he retired, and that because some changes in its practices were made after that discovery, those efforts justified some reduction in the amount of punitive damages awarded.

For these reasons, the District Court reduced the punitive damage award assessed against LeSuer to the amount of $18,000, and the amount of the punitive damage award assessed against Equitable to $4,000,000.

We conclude, based on our review of the record as set forth in previous portions of this opinion, that the District Court's findings, with the exception of Finding XII, are supported by substantial evidence and are not clearly erroneous. Finding XII, to the effect that LeSuer did not intend to harm the plaintiffs or others that he lied to, directly contradicts the District Court's Finding IV that LeSuer deliberately deceived the plaintiffs and

59

others for his own profit, knowing that by doing so, he reduced the amount of their insurance, and in some instances terminated their coverage. We conclude that that finding is not supported by substantial credible evidence, and therefore, is clearly erroneous.

For this reason, we conclude that the District Court did not abuse its discretion when it concluded that an award of millions of dollars was necessary to get Equitable's attention and that the very size of the punitive damage award was justified. We conclude, therefore, that Equitable's objections on appeal to the District Court's punitive damage award, and the findings on which that award was based, are without merit.

On the other hand, it is necessary to examine the District Court's reduction of the jury's punitive damage awards based upon the statutory framework for arriving at punitive damages.

While it is true that the district court is given broad discretion to either increase, decrease, or affirm a jury's punitive damage award, the jury's role is not without significance and cannot be ignored. Pursuant to § 27-1-221(7)(a), MCA, it is the jury which must first determine whether punitive damages are recoverable, and then, in a separate proceeding, determine, in the first instance, the amount of punitive damages to be awarded. To hold that the district court has complete and unbridled discretion to ignore the jury's award would mean that the function assigned to the jury in this process is meaningless. Therefore, we conclude that while the district court has broad discretion, that discretion must be exercised consistent with the greater weight of those

60

factors the district court is required to consider pursuant to § 27-1-221(7)(b)(i)-(ix), MCA.

That does not mean that the district court's function is simply to engage in a mathematical calculation to determine whether the majority of factors favor one disposition or the other. Under any given set of circumstances one factor may be weighted more heavily than others. For example, when a defendant's net worth has been established and simply precludes a substantial damage award, that factor may merit primary consideration. However, in those situations the district court must articulate why one factor weighs more heavily than the other in support of its decision if its decision is to alter the jury's punitive damage award.

In this case, all of the District Court's findings that pertained to those specific factors which the District Court was directed to consider by the legislature, with the exception of LeSuer's net worth, either explicitly or by inference supported the jury's punitive damage award. LeSuer's net worth could not be considered because he offered no evidence of that amount. We conclude that under these circumstances the District Court abused its discretion by then setting aside and reducing the jury's awards based simply on LeSuer's retirement and the fact that remedial action was taken by Equitable after the extensive and prolonged abuses which caused the damage done in this case.

For these reasons, we reverse the judgment of the District Court entered December 23, 1994, by which the jury's punitive damage awards were reduced. We affirm the verdict of the jury and

61

order that on remand judgment for the full amount of the jury's verdict, plus statutory costs and interest, be entered.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices