No. 85-251

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

TERRY HAWTHORNE MARTEL,

Plaintiff and Appellant,

-vs-

MONTANA POWER COMPANY,

Defendant and Respondent,

APPEAL FROM: District Court of the Fifth Judicial District,
In and for the County of Jefferson,
The Honorable Frank Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

R. Keith Strong argued; Church, Harris, Johnson &
Williams, Great Falls, Montana

For Respondent:

Lon T. Holden argued and Curtis G. Thompson argued,
Great Falls, Montana

For Amicus Curiae:

Eric Thueson, (For Rowan Ogden), Helena, Montana

Submitted: January 19, 1988

Decided: March 10, 1988

Filed: MAR 1 0 1988

*Ethel M. Harrison*

Clerk

Mr. Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Plaintiff Martel appeals the jury's special verdict finding the defendant Montana Power Company (MPC) 25% negligent; himself 75% negligent; and setting his damages at $290,000. He also appeals the order denying his motion for a new trial.

We affirm in part, reverse in part and remand with instructions.

The following issues were raised on appeal:

1. Did the trial court err when it declined to instruct the jury that contributory negligence is not a defense to willful and wanton misconduct?

2. Did the trial court destroy the protection of the National Electrical Safety Code (NESC) when it:

   a) gave only one instruction on the NESC and refused several others on specific NESC provisions?

   b) instructed the jury that comparative negligence was a defense under these circumstances?

   c) failed to instruct the jury that the NESC was only a minimum standard?

3. Did the trial court err when it refused to tell the jury the effect of comparative negligence on its verdict?

4. Did the trial court err when it allowed into evidence an interpretation of a construction standard which MPC did not have and had not used for design until the time of trial, and which had been received from its counsel just before trial?

5. Did the trial court err in allowing MPC to use the expert testimony of an employee involved with the suit months before trial, but identified only seven days before trial,

when another expert had been identified as the power company's primary expert and when appellant declined to make use of a continuance the trial court offered him?

6. Did the trial court err in granting MPC's motion to dismiss appellant's claim charging MPC with misrepresentation and bad faith under both the common law and the Unfair Trade Practices Act for its method of investigating and adjusting this accident?

On July 7, 1979, Terry Martel suffered permanent injuries as a result of being electrocuted when some portion of his body came within a few inches of an electric power transmission line carrying 100,000 volts. Martel testified that he had two beers with friends after they arrived at the old Piedmont Substation south of Whitehall, Montana. Martel was 19 at the time of the accident. The substation sits at the end of a short road off a county roadway.

After one other person climbed the tower, Martel also climbed it. A dispute in the facts exists as to whether Martel reached out to the line but the evidence is clear he did not touch the line. In any event, his proximity to the line caused electricity from the line to arch to his body causing serious injury.

The substation has a tower which supports the transmission line. The tower is crossed with metal brackets and sits on top of a concrete footing sunk in the ground. To climb it one must take a step from the ground to the footing, then to a bracket 17" from the concrete footing, then to another bracket 2' 3/4" above, then to a bolt step 4' 6 1/4" above that. Beyond that is a series of bolt steps leading to the top of the tower. No barricades surrounded the tower. A wooden sign was near the tower. The sign had been painted over but the word "danger" was still visible.

The Milwaukee Road built the substation prior to 1920 and MPC acquired it in 1974. MPC employees drove by the tower site at least once a month to examine the site. One employee and the Whitehall town marshal Rand McLester offered testimony that neither had ever seen children or any other unauthorized people on the tower.

Issue 1. Did the trial court err when it refused an instruction that contributory negligence is not a defense to willful or wanton misconduct?

Near the end of the plaintiff's case-in-chief the trial court ruled that plaintiff established a prima facie case of willful or wanton misconduct on the part of defendant power company. Although the court instructed the jury that they could find that MPC had acted willfully or wantonly, the court refused plaintiff's proposed instruction that comparative negligence was not an issue if they found the defendant had acted willfully or wantonly. The trial court correctly refused this instruction.

We said in Derenberger v. Lutey (Mont. 1983), 674 P.2d 485, 487-88, 40 St.Rep. 902, 906, that comparative negligence is inapplicable when the action is based on willful and wanton misconduct. In that case, we made a distinction between conduct that is willful and wanton and conduct that is merely negligent. When the defendant's conduct is willful and wanton, the plaintiff's own mere negligence could not be used to offset his recovery. We now conclude that this distinction is faulty and expressly overrule Derenberger.

Prior to the enactment of comparative negligence, the rule preventing comparison of willful and wanton conduct and mere negligence served to ameliorate the harshness of the defense of contributory negligence which would bar all recovery to the plaintiff. Fortunately, we now operate under a scheme of comparative negligence where there is no danger

- 4 -

of a plaintiff's slight negligence barring all recovery against a willful and wanton or grossly negligent defendant. See § 27-1-702, MCA as enacted in 1975 and amended in 1983. The rationale for the rule in Derenberger no longer exists.

It is more appropriate, then, as Justice Gulbrandson pointed out in his concurring and dissenting opinion in Derenberger, to adopt the interpretation from the state where our comparative negligence statute originated. The Wisconsin Supreme Court ruled that negligence in all its forms, gross, willful and wanton or ordinary, can be compared to and offset by each other under its comparative negligence statute. Bielski v. Schulze (Wis. 1962), 114 N.W.2d 105, 111-114. In 1975, Montana adopted the Wisconsin statute. We hold, therefore, that all forms of conduct amounting to negligence in any form including but not limited to ordinary negligence, gross negligence, willful negligence, wanton misconduct, reckless conduct, and heedless conduct, are to be compared with any conduct that falls short of conduct intended to cause injury or damage. The trial court is affirmed on this issue.

Issue 2. Did the trial court destroy the protections of the NESC when it:

a) gave only one instruction on the NESC and refused several others on specific NESC provisions?

b) instructed the jury that comparative negligence was a defense under these circumstances?

c) failed to instruct the jury that the NESC was only a minimum standard?

Appellant Martel argues that failure to give the comparative negligence instruction as well as failure to give several other instructions regarding specific NESC provisions resulted in destroying the protections provided by the NESC. We agree with appellant's position that plaintiff's

instructions no. 14 and 15 should have been given and, further, that the jury should have been instructed that the NESC was only a minimum standard. However, we agree with the trial court that the jury should have been instructed on comparative negligence as a defense under these circumstances.

2a.

Since 1917, the legislature has incorporated the NESC in one form or another into the Montana statutes and requires utilities in Montana to construct, install and maintain lines and equipment so as to reduce hazards to life as far as practicable. Section 69-4-201, MCA. A look at previous versions of § 69-4-201 shows the legislature has also used the terms "future construction" since 1917. Since then the NESC has addressed the areas of electrical regulation involved in this case. Utilities, including MPC have understood it to be their duty to follow these standards. MPC witnesses testified they understood that a violation of these standards is contrary to Montana law.

Martel argues that NESC construction standards apply to this case and are controlling. MPC did not build the particular tower in question. However, its engineers testified that when MPC buys a facility, or when it contracts with someone else to build a facility for them, MPC has a duty to inspect to see that the facility complies with the NESC. Appellant's argument is correct.

Appellant claims that plaintiff's instructions no. 12, 13, 14 and 15 were wrongly denied and that the protections of the NESC were thereby destroyed. Instructions no. 12 and 13 were the 1973 NESC version and differed slightly from instructions no. 14 and 15, the 1977 NESC version.

Plaintiff's proposed instructions no. 14 and 15 stated as follows:

No. 14.  The Montana Power Company must comply with the National Electrical Safety Code in its construction.  Portions of the National Electrical Safety Code reads as follows:

"211.  Installation and Maintenance
     All electric supply and communication lines and equipment supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as is practical.

214.  Inspection and Tests of Lines and Equipment
A.  When In Service.

     1.  Initial Compliance with Rules
     Lines and equipment shall comply with these safety rules when placed in service.

     2.  Inspection
     Lines and equipment shall be inspected from time to time at such intervals as experience has shown to be necessary.

     3.  Tests
     When considered necessary, lines and equipment shall be subjected to practical tests to determine required maintenance.

     4.  Record of Defects
     Any defects affecting compliance with this code revealed by inspection or tests, if not promptly corrected, shall be recorded; such records shall be maintained until the defects are corrected.

     5.  Remedying Defects
     Lines and equipment known to be defective so as to endanger life or property shall be promptly repaired, disconnected, or isolated."

     If you find that the Montana Power Company did not install or maintain this tower in compliance with the sections of the National Electrical Safety Code quoted above, then you must find that the Montana Power Company was negligent.

No. 15. The Montana Power Company must make its construction projects comply with the National Electrical Safety Code.

A portion of the National Electrical Safety Code reads:

"280. Structures for Overhead Lines
    A. Supporting Structures
        1. Protection of Structures
            b. Climbing
                Readily climbable supporting structures such as closely latticed poles or towers, including those attached to bridges, carrying open supply conductors energized at more than 303 volts, which are adjacent to roads, regularly travelled pedestrian thoroughfares, or places where persons frequently gather (such as schools or public playgrounds) shall be equipped with barriers to inhibit climbing by unqualified persons or posted with appropriate warning signs.

        2. Steps
            Steps permanently installed on supporting structures shall not be closer than 8 feet from the ground or other accessible surface."

If you find that the Montana Power Company's construction did not meet the requirements of the National Electrical Safety Code set out above, then you must find that the Montana Power Company was negligent as a matter of law.

MPC's engineers testified that these provisions were designed to protect anyone around the towers regardless of age or authorization.

MPC contends that proposed instructions no. 12 and 14 were correctly refused because they state that "[T]he MPC must comply with the National Electrical Safety Code in its construction" and such statements are not applicable since

- 8 -

MPC did not construct the tower. Also, respondent disputes these instructions claiming the jury *may* find respondent negligent if it violated certain NESC sections whereas the instruction stated it *must* so find.

The manner in which the footing, braces and channel irons were configured to provide access to the bolt ladder that led to the top of the tower is a matter of construction and design standards, as is the matter of installing barriers around towers or signs. The standards of the NESC should not be limited to a narrow meaning of the word "construction" but should imply an obligation to comply with the standards in the broader sense of "design" as well. Although MPC did not initially construct the tower it must still bring its "design" within the NESC standards. This duty may also include elements of maintenance.

We held in Barmeyer v. Montana Power Co. (Mont. 1983), 657 P.2d 594, 40 St.Rep. 23, that through § 69-4-201, MCA, the legislature incorporated only the NESC construction standards. Therefore violations of nonconstruction NESC standards were merely evidence of negligence and not negligence as a matter of law. 657 P.2d at 602-03. Upon reflection, this seems an overly narrow interpretation of the statute. One of the purposes of the NESC is to ensure the safeness of electrical systems that have life-threatening capabilities. If a utility can avoid complying with these standards by purchasing constructed lines and towers instead of constructing them itself, the NESC becomes ineffectual. It is unlikely that the legislature intended such a result when it incorporated the NESC into § 69-4-201, MCA. We have recognized that a violation of statutes intended to protect the public is negligence per se. Stepanek v. Kober Const. (Mont. 1981), 625 P.2d 51, 55, 38 St.Rep. 385, 391. We therefore overrule <u>Barmeyer</u> and hold that violations of

maintenance and design standards intended to protect the public are also negligence per se. However, to be complete the trial court should inform the jury that in this action a violation of law is of no consequence unless it contributed as a proximate cause to an injury found by the jury to have been suffered by the plaintiff.

We hold that plaintiff's instructions no. 14 and 15 properly may be given upon retrial after a modification to show that MPC must comply with the construction, maintenance and design standards of the NESC. We further hold that plaintiff's proposed instructions no. 12 and 13 were correctly refused since they quoted the 1973 version of the NESC and therefore were not applicable law at the time of the accident in 1979.

## 2b.

Issue 2b is whether the protections of the NESC were destroyed when the trial court allowed the jury to consider the comparative negligence of the plaintiff even after a prima facie case of willful and wanton conduct on the part of the defendant had been demonstrated by the plaintiff. This issue is resolved by the holding in issue 1 and need not be addressed further.

## 2c.

Finally appellant contends that denial of plaintiff's instruction no. 16 further destroyed NESC protections. The instruction reads:

> The National Electrical Safety Code is a minimum standard only. You may find that the Montana Power Company was negligent as defined in these instructions even if you find that the Montana Power Company fully complied with all the provisions of the National Electrical Safety Code in evidence in this case.

In keeping with our holding that a violation of these NESC standards is negligence per se we further note that bare compliance with a statute such as § 69-4-201, MCA, does not necessarily establish due care. If the circumstances are such that a danger exists beyond the minimum which this statute was designed to meet, then the jury may be informed that a defendant is negligent for not doing more. For this reason plaintiff's proposed instruction no. 16 should not have been refused by the court.

Issue 3. Was it error for the trial court to refuse to tell the jury the effect of comparative negligence on the verdict?

We hold that it was error. The applicable statute, § 27-1-702, MCA (1978), provides that a plaintiff may recover damages for injury if the plaintiff's "negligence was not greater than the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering." The purpose of this statute is to remove the harsh treatment of contributory negligence on the part of plaintiff under the old scheme that prevented any recovery for any negligence of the plaintiff.

MPC argues that the scale may have gone too far the other way, and juries informed of the legal effect of comparative negligence are overly generous to the negligent plaintiff. It argues that the jury's determination of damages will reflect the jury's sympathies for the plaintiff's injuries rather than reflect its computation of actual damages sustained and offset by the plaintiff's own negligence.

In opposition, Martel argues that juries, not informed of the legal effect of their apportionment of negligence, operate in the dark. This, he argues, makes it impossible to

- 11 -

tell whether the amount of damages awarded is based on the jury's determination of actual damages or whether it is infected with speculation about the effect of its apportionment of negligence.

We have held that the jury can objectively consider the facts before it. Owens v. Parker Drilling Co. (Mont. 1984), 676 P.2d 162, 166, 41 St.Rep. 66, 71. In fact, we have refused to order a new trial based upon the reasons defendant gives. In North v. Bunday (Mont. 1987), 735 P.2d 270, 277, 44 St.Rep. 627, 636, we expressly recognized the integrity of the jury in determining negligence percentages when we stated:

> We cannot impugn the integrity of the jury that it indulged in that kind of manipulation. The single duty of the jury in this case was to determine the applicable percentages of negligence, if such negligence existed. We cannot order a new trial in this case upon the mere speculation that if the jury could foresee the precise effect of their factual determination, even though not called on to determine damages, their factual determination would be different from what they decided.

We are persuaded by appellant's argument that the jury speculated about the effect of its percentage determinations. During deliberations the jury sent a note to the judge, "Do the percentages in question #4 apply to monetary compensation in question #5?" The judge answered, "Dear Folks: You must answer each question separately by 8 or more of your number."

We think Montana juries can and should be trusted with the information about the consequences of their verdict. Other jurisdictions have considered this question and have come to differing conclusions. An excellant review of the holdings in those jurisdictions is set forth in the Idaho case of Seppi v. Betty (Idaho 1978), 579 P.2d 683. After a lengthy discussion, the Idaho Supreme Court concluded that it

is naive to believe that jurors do not speculate about the effect of their answers. To end speculation, the Idaho court said juries should be informed of the effect of their answers. Seppi, 579 P.2d at 691. The Idaho court tempered its position by giving the trial court the discretion not to inform the jury in those cases where the issues are so complex or uncertain that the jury would only be confused. Seppi, 579 P.2d at 692.

We adopt the reasoning of the Idaho Supreme Court and hold that under the circumstances of this case the jury should have been informed of the effect of its verdict. Upon the request of a party, the court must give this instruction unless it finds the issue so complex as to confuse the jury.

Issue 4. Did the trial court err when it allowed into evidence an interpretation of a construction standard which MPC did not have and had not used for design until the time of trial and had received from its counsel just before trial?

Since we are remanding the case we will discuss this issue only for purposes of guidance upon remand. Much of the trial focused on whether the tower was "readily climbable," or "closely latticed" as those terms appeared in the 1973 and 1977 NESC, § 280. The trial court allowed into evidence a copy of a 1984 interpretation of those terms written by the Institute of Electrics and Electronic Engineers in response to a request by an entity having difficulty applying those terms to a tower built in 1911. The interpretation was, as yet, unpublished and undistributed and MPC's counsel seemed to be the only one in possession of the interpretation.

Appellant claims that this exhibit was totally irrelevant under Rule 401, M.R.Evid. and if admitted, any probative value would be outweighed by the danger of unfair prejudice and confuse and mislead the jury under Rule 403, M.R.Evid.

We hold it was error to admit the 1984 § 280 interpretation into evidence as a construction standard which MPC did not have and had not used for design until the time of trial, and which had been received from its counsel just before trial. At a new trial, the interpretation can be admitted upon the laying of a proper foundation.

Issue 5. Did the trial court err in allowing MPC to use the expert testimony of its employee Pat Rice who was involved with the suit months before trial but was identified only seven days before trial, when another expert had been identified as the power company's primary expert and when appellant had declined to make use of a continuance the trial court had offered him?

This issue is moot and need not be discussed further.

Issue 6. Did the trial court err in granting MPC's motion to dismiss Martel's claim charging MPC with misrepresentation and bad faith under both the common law and the Unfair Trade Practices Act?

The trial court dismissed Count II of appellant's second amended complaint for failure to state a claim. Count II alleges that MPC, through its insurance adjuster, was liable for negligent and fraudulent misrepresentation; breach of defendant's common law duty to act in good faith and fair dealing with appellant; and violation of the Unfair Trade Practices Act because, as a company self-insured up to $500,000 of its losses, its adjuster's actions were tortious, malicious, oppressive and unjustified.

Appellant claims that the adjuster presented himself as an investigator for the Public Service Commission (PSC) and that he was a state official on official business. He claims most of the information gained was not transmitted to the PSC but rather retained in MPC's files. Furthermore, the adjuster questioned appellant's parents at the site of the accident and his friends and relatives as they sat outside

the emergency room. Appellant contends this amounts to a tort in and of itself.

In addition, appellant argues that the trial court erred first by not assuming the facts alleged in the complaint to be true for purposes of a motion to dismiss. Rule 12(b)(6), M.R.Civ.P. Secondly, the court essentially rendered summary judgment for the defendant by assuming certain facts would be proved. Appellant contends that this, along with not informing the parties that the court is treating the motion as one for summary judgment, is error under Gebhardt v. D. A. Davidson & Co. (1983), 203 Mont. 384, 389, 661 P.2d 855, 857.

Appellant further contends the substantive law is also in his favor. He alleges the adjuster's activities were performed in accordance with deliberate corporate policy and performed by a skilled, experienced and trained agent and appellant was harmed by these actions. The situation is also aggravated because the same agent working for MPC allegedly investigates and adjusts for MPC's excess insurance carrier.

The latter portion of Count II alleged MPC was liable under § 33-18-201, MCA, because that section of the Unfair Trade Practices Act provides a right of action to injured third persons. Klaudt v. Flink (1983), 202 Mont. 247, 252, 658 P.2d 1065, 1067. In opposition, respondent argues MPC was under a legal obligation to investigate the accident and report to the PSC. Section 69-3-107(2), MCA. MPC claims Count II did not allege the adjuster misrepresented his employment nor did it contain allegation of any duty owed by MPC which was breached and consists of unsupported conclusory statements. They argue dismissal was correctly based on the failure to state a claim.

This Court recently held in Ogden v. Montana Power Co. (Mont. 1987), 747 P.2d 201, 44 St.Rep. 2068, that a self-insured electric utility which is primarily in the

business of providing power to customers was not, at the time of Martel's accident, regulated by the Unfair Trade Practices Act, § 33-18-101, et seq. MCA (1985). The Act only covered those in the business of insurance. Therefore, the appellant can state no claim against MPC based on this act. Nor may appellant state a claim based on a common law duty to investigate claims and to attempt in good faith to make prompt and fair settlements where liability is reasonably clear. Ogden, 747 P.2d at 205. The trial court correctly dismissed Count II of appellant's second amended complaint.

We affirm in part, reverse in part and remand.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

- 16 -