JUSTICE NELSON,
concurring in part and dissenting in part.
¶117 I concur in the Court’s Opinion as to Issues 1, 2, and 3 but dissent as to Issue 4.
¶118 At the outset, I note that this is the second time in as many years that this Court has stripped plaintiffs of hard-earned and well-deserved jury awards of punitive damages. With today’s decision, as *357 with its predecessor (Sunburst School Dist. No. 2 v. Texaco, Inc., 2007 MT 183, 338 Mont. 259, 165 P.3d 1079), this Court imposes conflicting evidentiary rules regarding proof of compliance with minimum government standards: such evidence is not admissible regarding liability for compensatory damages but is admissible regarding liability for punitive damages. At best, this approach forces jurors into needless and infeasible mental gymnastics. At worst, as in Sunburst, this approach forces the Malcolms to retry their entire case to a different jury, with the concomitant waste of time, money, and resources to the civil justice system-a “dilemma” left unresolved in Sunburst and unresolved here. See Sunburst, ¶ 86; Opinion, ¶¶ 102-103.
¶119 Moreover, the Court’s approach provides the camel’s nose in the tent for corporations, such as Evenflo, which ask this Court (and, presumably, the Legislature) to abrogate well-settled, decades-old principles of Montana strict liability law[1] in favor of the controversial Restatement (Third) of Torts: Products Liability §4(b), which makes admissible in defective design and inadequate instructions/warnings cases the product’s compliance with an applicable product safety statute or administrative regulation. Although the Court claims to reject §4(b), Opinion, ¶ 39, the Court for all practical purposes does exactly the opposite by allowing evidence of compliance with minimum government standards to be introduced for purposes of punitive liability during the very same proceeding in which the jury considers the preliminary question of whether the defendant is liable for the alleged tort, Opinion, ¶¶ 102-103. The Court asserts that we “must trust that the jury will heed the court’s instructions as to how to evaluate the evidence presented.” Opinion, ¶ 103. In other words, we must trust that the jurors will somehow put the compliance evidence completely out of their minds for purposes of tort liability and compensatory damages. Yet, it is precisely because we cannot rely on the jury to parse evidence in this manner that we require evidence of the defendant’s financial worth to be presented in a separate proceeding. See §27-l-221(7)(a), MCA. While the Court purportedly “slams the door” on the camel’s nose, Opinion, ¶ 40, the fact is that before Sunburst and today’s decision, this Court had barred the camel *358 completely from the tent. Predictably, his bruised nose notwithstanding, once the camel has had a whiff, he will return in more earnest.
¶120 Bottom line, the Court’s approach will continue detrimentally to impact the victims of toxic torts, those injured by negligent conduct, and, as here, individuals and families devastated by injury and death caused by dangerous and defective products placed into the stream of commerce by corporations whose focus is on self-aggrandizement rather than the health, safety, and welfare of the consumer.
¶121 I disagree with the Court’s decision to vacate the Malcolms’ punitive damages award and remand this case to the District Court for a retrial just so that Evenflo can present evidence of its purported “good faith” compliance with Federal Motor Vehicle Safety Standard 213 (FMVSS 213). Evenflo has failed to demonstrate that the District Court abused its discretion in excluding this evidence, and Evenflo has failed to demonstrate that it was prejudiced as a result of the court’s ruling.
No Prejudice
¶122 Addressing the latter point first, it is important to recall that Tn]o error in ... the exclusion of evidence ... is ground ... for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.”M. R. Civ. P. 61. Moreover, the court “must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.” M. R. Civ. P. 61. Thus, we have stated that
[o]ur analysis does not end ... if an appellant demonstrates that a district court has abused its broad discretion in rendering an evidentiary ruling. We must then determine whether the demonstrated abuse of discretion constitutes a reversible error. As we have held, no reversible error occurs unless a substantial right of the appellant is affected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial.
Seltzer v. Morton, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561 (citations omitted).
¶123 As discussed below, I do not agree with Evenflo and the Court that the District Court abused its discretion in excluding evidence of Evenflo’s compliance with FMVSS 213. Indeed, Judge Swandal’s orders reviewing the punitive damages award and denying Evenflo’s *359 post-trial motions are exceptionally well-researched, well-reasoned, and well-written, and they fully support his evidentiary rulings. But assuming for the moment, and for the sake of argument, that the court did abuse its discretion and that the 213 compliance evidence was relevant, EvenfLo has not shown that it suffered prejudice.
¶124 The jury was instructed that liability for punitive damages could be imposed only if EvenfLo was guilty of actual fraud or actual malice. The court gave the jury the following definitions, which are consistent with §27-1-221(2) and (3), MCA:
Fraud: “[Ejither the making of a representation by the defendant with knowledge of its falsity or concealing a material fact with the purpose of depriving the plaintiff of his/her property or legal rights or otherwise causing him/her injury.”
Malice: The defendant ‘has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff,” and the defendant either “deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff’ or “deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.”
Given the overwhelming and compelling evidence of fraud and malice presented at trial, it simply cannot be said that evidence of EvenfLo’s compliance with FMVSS 213 would have affected the jury’s verdict on Evenflo’s liability for punitive damages. If anything, the jury might well have punished EvenfLo more harshly had it known that EvenfLo was seeking to excuse its reprehensible conduct by arguing that it had complied with FMVSS 213, even though EvenfLo knew all along that FMVSS 213 contained only the “minimum” requirements for safety design and even though EvenfLo had been told by the National Highway Traffic Safety Administration that “mere compliance with the minimum requirements of the standard is not enough.” In any event, the following evidence of actual fraud and actual malice was adduced at trial and, as the District Court noted, was established “by substantial, clear and convincing evidence.”
¶125 On the evening of July 16, 2000, Jessica Malcolm was driving home with her son, four-month-old Tyler, properly secured in the back seat of the family Suburban in one of Evenflo’s On My Way (OMW) child safety seats. She was forced off the highway, and her vehicle rolled three times down a steep incline. During the 50-mile-per-hour rollover, the left plastic seat-belt hook of Tyler’s car seat broke off. The seat then slipped out of the open-ended belt hook on the opposite side of the seat and came loose from the vehicle’s seatbelt. The car seat, *360 with Tyler still strapped inside, was ejected from the Suburban and thrown through the air more than 60 feet. The upper left corner of the seat hit the ground, and the force of this impact transferred through the hard plastic shell, fractured Tyler’s skull, and caused fatal brain damage. Had the seat remained restrained in the vehicle, there is virtually no chance that Tyler would have died in the rollover. Had the seat been lined with energy-absorbing padding, the extent of his injuries could have been mitigated and his death could have been prevented.
¶126 Evenflo knew at all times that the basic purpose of a child safety seat is to restrain the child inside the vehicle to minimize the risk of ejection and that if the restraint fails and a child, still strapped in the safety seat, is ejected, the risk of serious injury or death is increased dramatically. Evenflo also knew that a restraint system utilizing U-shaped, open-ended plastic seat-belt hooks was prone to fail, which could and did result in the OMW seat coming loose from the vehicle’s seatbelts in both simulated and real-world accidents. Despite this knowledge, all models of the OMW seat produced and sold from 1994 through 2002 relied on open-ended plastic seat-belt hooks to secure the seat to the vehicle’s seatbelt.
¶127 Evenflo knew from the outset that the OMW seat could have employed a feasible alternative design: one requiring the vehicle’s seatbelt to be routed through an enclosed seat-belt “tunnel” (as opposed to an open belt hook). This ‘bomb proof’ design provides a substantial margin of safety and virtually elimin ates the risk of a loss of restraint during an accident. Even before the OMW seat went into production, Evenflo used the tunnel design on most of its infant and convertible safety seats, and Evenflo then used it on the detachable base of the OMW seat itself. During the years it used this design, Evenflo knew of no instance in which an enclosed tunnel restraint system had failed and resulted in a loss of restraint, either in sled tests or in real-world accidents. When questioned at oral argument as to why Evenflo nevertheless chose the open hook design for the OMW, counsel asserted, ironically, that this design is more “user friendly.”
¶128 All OMW seats lack protective foam padding, such as Expanded PolyStyrene (EPS), on the inside shell and sidewings. Such padding reduces the risk of head injuries to the infant in the event of an impact, and Evenflo utilized EPS padding in the shells of some of its safety seats for that very reason. Other manufacturers also utilized protective foam in the shells of their car seats prior to and during the eight years Evenflo sold the OMW seat. However, in 1993 (more than *361 two years before Tyler Malcolm’s OMW seat was produced), Evenflo considered whether energy-absorbing foam should be incorporated into the OMW design and decided that the OMW seat-with its unpadded, hard plastic surfaces-was, in Evenflo’s own words, “acceptable as is.”
¶129 Evenflo marketed the OMW seat with knowledge of the dangers inherent in its design. As early as February 1995, Evenflo possessed videotapes which documented its own testing and showed OMW production models breaking apart in the area of the automobile seat-belt path and, due to the OMW’s open belt hook design, coming loose from the test sled’s seatbelt and ejecting from the sled. The cracks, rips, and tears in the shells of the tested OMW seats and the related loss of restraint provided Evenflo with notice that its OMW design exposed infants to the risk of severe injury or death from the seat’s coming loose from the seatbelt and banging around inside the vehicle or, as in Tyler’s case, being ejected from the vehicle.
¶130 Evenflo briefly halted production of the OMW seat in June 1995 to conduct a “consumer corrective action/recall campaign.” Evenflo represented to the National Highway Traffic Safety Administration (NHTSA), to owners of OMW seats, and to the general public that the hazard posed by the OMW design was a “separation” under the seat’s cloth padding that resulted in a sharp edge which could cause a “cut or pinch” hazard to the child. Evenflo did not disclose that the OMW’s seat-belt hooks, and in some instances the entire corner of the OMW seat, had broken off during testing and, due to the open belt hook design, had allowed the seat (with the crash test dummy still strapped in) to fly off the test sled-a fact that Evenflo had recorded on videotape. Indeed, even though dozens of OMW seats had broken apart in sled tests, Evenflo concealed that information and reported just four “separations” creating a “cut or pinch” hazard. Evenflo did not provide NHTSA with its videotapes showing OMW seats flying off the sled-test seats or any of its other documents and test reports that would have revealed the true hazard: potentially deadly ejections.
¶131 After making changes to the plastic mold at a total cost of $2,500, Evenflo resumed manufacturing and selling OMW seats just a few weeks after announcing the recall. Evenflo did not change the open belt hook design or the unpadded shell design and did not inform the public of the problems with these designs. Moreover, Evenflo had no idea why some of its OMW seats were cracking and breaking in tests and others were not, and the design flaw responsible for the cracks, rips, and tears was never discovered. Thus, no true ‘fix” was *362 ever implemented.
¶132 With respect to the 200,000 OMW model 206 seats it had manufactured and sold at the time of the recall, Evenflo decided to save money by designing a plastic “retrofit kit” which it mailed to current OMW users with instructions to install a plastic insert to the underside of the safety seat using double-sided tape. With respect to the 55,000 seats it had produced but not yet sold, Evenflo installed the “retrofit kit” itself, rebranded the seats as model 207x, and sent all 55.000 seats to retailers. Evenflo took these actions with knowledge that it had not eliminated the deadly hazards posed by the weak open-ended plastic seat-belt hooks and the lack of EPS padding.
¶133 After restarting production, Evenflo continued to withhold from NHTSA and the public its knowledge that the OMW seat was continuing to crack, tear, or peel back in the area of the automobile seat-belt path at a dangerously high rate. Of the 580 sled tests run on both prototype and production versions of the OMW seat without its detachable base, more than one out of four (27%) of these “safety’ seats cracked, tore, ripped, separated, or peeled back at or near the open-ended belt hook. Thus, if all of the 3.7 million OMW seats manufactured by Evenflo were involved in collisions where the resulting forces equaled or exceeded the forces generated in the 27 to 30 mile-per-hour simulated frontal collisions conducted by Evenflo, 999.000 could be expected to fail completely or at least crack, rip, tear, or demonstrate physical evidence of impending failure in the area of the seat-belt path, which in turn could lead to a loss of restraint.
¶134 Well before Tyler Malcolm was killed, Evenflo was aware that both retrofitted and production model post-recall OMW seats were breaking in real-world rollover accidents and coming loose from the automobile seatbelts. In 1997, Ruthie Gonzales of Merced, California reported to Evenflo that the seat-belt hook on her retrofitted model 207 seat had broken off during a rollover accident. The seat came loose from the vehicle’s seatbelt and ended up on her front dashboard. In 1999, Devon Orneleas of Patterson, California reported to Evenflo that both seat-belt hooks had broken off her model 207 seat in a rollover accident. The seat came loose from the vehicle’s seatbelt and flew forward when the seat’s hooks fractured and broke away. She found her baby, still secured in the seat, on the front floorboard after the rollover.
¶135 Yet, rather than take corrective action or notify NHTSA or the public of OMW’s propensity to fail and become unrestrained in rollover collisions, Evenflo moved the Gonzales and Orneleas seats to its *363 storage warehouse and concealed this information. Indeed, when Ms. Orneleas reported that she believed the OMW seat was defective because the seat-belt hooks had broken off her model 207 seat during a rollover, Evenflo responded that it had never before heard of such a thing happening. At the time it made this blatantly false representation, Evenflo knew fall well that similar shell cracks and failures were occurring in its sled tests and that Ms. Gonzales’s OMW seat was in its warehouse, broken seat-belt hook and all. Moreover, Evenflo told Ms. Orneleas that the OMW seat was designed to withstand only a 30 mile-per-hour frontal crash, rather than the physical forces present in a rollover crash. However, Randolph Kiser, Evenflo’s Director of Product Safety, admitted at trial that rollover accidents involving OMW seats were perfectly foreseeable.
¶136 A number of other OMW users, who were involved in rear-impact, side-impact, and rollover accidents where the open belt hooks did not break, also reported to Evenflo that the seats had come loose from the automobile seatbelts. Yet, when Jessica Malcolm called Evenflo to ask whether the OMW seat was “safe to use” with her soon-to-be-born child, Evenflo told her that the seat was safe to use and that there were no problems with it. Evenflo did so despite knowing that dozens of OMW seats had been cracking in tests, despite knowing that the belt hooks had been breaking off in real-world accidents like the Gonzales and Orneleas rollovers, and despite knowing that unbroken OMW seats had been coming loose from the vehicle’s seatbelts in other types of accidents. Randolph Kiser testified that Evenflo’s position was that Jessica did not have the right to know about any cracks, rips, or breaks in the OMW seats (either in testing or in real-world accidents). Kiser stated that as far as Evenflo was concerned, no consumer had the right to know about the shell failures and ejections because Evenflo did not consider them to be a “rampant safety related defect.”
¶ 13 7 Evenflo has no way of determining how many OMW seats were actually involved in accidents. Neither Evenflo nor the government tracks that information, and Evenflo’s document-retention policy in the 1990s required that documents pertaining to injuries or deaths resulting in claims or lawsuits be destroyed one year after the matter was concluded.
¶138 In sum, Evenflo knew that the purpose of an infant child safety seat, including its OMW seat, is to restrain a child safely to the vehicle’s seatbelt in a protective cocoon of the seat’s shell during a motor vehicle accident. Moreover, Evenflo knew full well that by virtue of its design, the OMW seat was prone to crack, rip, and tear when *364 placed under load, resulting in a complete loss of restraint. And Evenflo’s Randolph Kiser admitted at trial that the probability of serious injury or death to an infant strapped in a car seat increases dramatically when the seat becomes unrestrained. Nevertheless, Evenflo consciously manufactured and marketed the OMW seat as a product intended to keep infants safe and secure while traveling in a motor vehicle. Furthermore, Evenflo considered whether to add protective EPS padding to the hard plastic shell of the OMW seat to protect the infant passenger from skull fractures but decided that the product was “acceptable as is.” As the District Court observed, the words “acceptable as is,” as used by Evenflo here, constitute “a perfect three-word definition of‘actual malice.’ ’’Evenflo evinced a complete indifference to an infant’s vulnerability to physical injury or death while strapped in one of its OMW seats, and as a result, Tyler Malcolm died. Indeed, when asked point-blank by the consumer, Jessica Malcolm, if the OMW seat was safe, Evenflo lied to her and told her that it was safe and that there were no problems with it.
¶139 Evenflo manufactured the OMW seat for eight years with knowledge (much of it recorded on its own videotapes, accident reports, and sled-test records) of the risks and dangers posed by the seat’s design. Worse still, Evenflo concealed this information not only from NHTSA and the general public, but also from Jessica Malcolm specifically. Any doubt about whether this deceit was intentional was dispelled by Evenflo’s corporate representative, Randolph Kiser, who testified unapologetically that neither Jessica Malcolm nor any other concerned parent was entitled to information about the OMW seat’s deficiencies and the potentially deadly hazards the seat posed to children until Evenflo, in its own judgment, decided that the safety-related defects were “rampant.”
¶140 In light of all this evidence, the District Court observed in its order reviewing the punitive damages award that Evenflo’s misconduct was ‘heither isolated, nor accidental.” In fact, Evenflo’s motive was “exclusively profit driven.” And Evenflo’s reprehensible conductwfiiich extended over an eight-year period, involved the knowing distribution of millions of defectively designed automobile child-restraint seats, and resulted in one of the worst forms of physical harm (the death of a child)-was “among the most egregious to be encountered in a strict liability in tort, design defect case.” Indeed, the court noted, the State of Montana considers the probability of serious injury or death to an unrestrained child in a motor vehicle to be so great and so well-known that placing an infant in a vehicle without a proper restraint *365 constitutes a criminal act (citing §61-9-419 and -420, MCA). Having heard the witnesses and seen the evidence, the District Court concluded that “[i]t is difficult to conceive a template more naturally fitted to the most virulent form of profit-motivated reprehensibility.”
¶141 In the face of all of this, Evenflo complains that it should have been allowed to tell the jury about its compliance with FMVSS 213. FMVSS 213 sets forth minimum requirements for child-restraint systems, see 49 C.F.R. § 571.213, and NHTSA required Evenflo to conduct internal testing of its OMW seats to determine if they complied with these requirements. FMVSS testing involves a front-end sled test at speeds of 27 to 30 miles per hour. FMVSS 213 does not require (nor does it preclude) side-impact, rear-impact, rollover, or high-speed testing.
¶142 Congress expressly cautioned, however, that “[cjompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law.” 49 U.S.C. § 30103(e). Indeed, Congress intended that “compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability.” H.R. Rpt. 89-1776 at 24 (July 28, 1966). Moreover, NHTSA Administrator Ricardo Martinez, M.D. sent a letter to Evenflo and other manufacturers in September 1999 stating that “with the safety of our Nation’s children at issue, mere compliance with the minimum requirements of the standard is not enough.” Dr. Martinez urged each manufacturer of child restraints “to ensure that their restraints perform above the minimum requirements of our standard.” See 65 Fed. Reg. 1224, 1224-25 (Jan. 7, 2000) (emphasis added). Along these same lines, this Court warned, before Evenflo started selling its OMW seats in Montana, that bare compliance with a minimum standard does not necessarily establish that the defendant acted with due carecer, as applied in the punitive damages context, that the defendant acted without deliberate indifference to the high probability of injury to the plaintiff. If the circumstances are such that a danger exists beyond the minimum which the standard was designed to meet, then the defendant is liable for not doing more. See Martel v. Montana Power Co., 231 Mont. 96, 104, 752 P.2d 140, 145 (1988).
¶143 The Court asserts that Tejvidence of Evenflo’s good faith effort to comply with all government regulations, including FMVSS 213, ‘would be evidence of conduct inconsistent with the mental state requisite for punitive damages.’ ” Opinion, ¶ 99 (quoting Sunburst, ¶ 81). The Court opines that ‘Evenflo may have been able to persuade *366 the jury that its compliance with FMVSS 213 showed that it had not evinced ‘deliberate indifference’ to the welfare of the occupants of the OMW.” Opinion, ¶ 100. I disagree. For one thing, it is doubtful that Evenflo’s proffered evidence even constitutes evidence of a “good faith effort to comply with all government regulations.” The fact of the matter is that Evenflo did not comply in “good faith” with FMVSS 213; rather, Evenflo deliberately concealed from NHTSA the fact that OMW seats were breaking apart in Evenflo’s sled tests and were flying off the sled-test seats. Furthermore, given the mountain of evidence presented at trial that Evenflo knowingly misrepresented to Jessica Malcolm the risks and dangers posed by the design of the OMW seat, that Evenflo concealed from her certain material facts about the safety of the seat, and that Evenflo deliberately proceeded to act in conscious disregard of the high probability of injury to Tyler, there is no reasonable possibility that the jury, based simply on Evenflo’s supposed “good faith” compliance with FMVSS 213, would have reached a different outcome, i.e., would have found Evenflo not liable for punitive damages. Seltzer, ¶ 65.
¶ 144 Indeed, while it purportedly was complying in “good faith”with FMVSS 213, Evenflo knew the following: that mere compliance with the minimum requirements of the standard ‘is not enough,” particularly where a danger exists beyond the minimum that the standard was designed to meet; that NHTSA wanted Evenflo’s child restraints to “perform above the minimum requirements”; that FMVSS 213 addressed only frontal collisions; that the OMW seat’s open belt hook design had failed in a number of rear-impact, side-impact, and rollover accidents; and that Evenflo, therefore, needed to go beyond the minimum requirements of FMVSS 213 in its design of the OMW seat. Evenflo also knew how to test its safety seats in rollover crash scenarios, but Evenflo never chose to conduct rollover tests on the OMW seats. Rather, Evenflo was content to do only the bare minimum; and it only did that much because it could not have sold the OMW seat otherwise. As the District Court pointed out, Evenflo could not receive one dime of profit if it did not first subject the OMW seat to FMVSS 213 testing. Thus, based on the evidence, the court concluded that
[e]ach and every act of Evenflo relating to [its] adherence to FMVSS 213 was intended solely to free the company up to sell, and profit from, the On My Way. This includes stopping production of the OMW when it realized it could not entirely conceal the seat’s non-compliance with FMVSS 213; writing to NHTSA, characterizing the hazard posed by the noncompliance *367 as the risk of a “cut or pinch”; and making the bare minimum revisions it could to get the On My Way to comport with the minimal requirements of FMVSS 213 (none of which applied to rollover accidents) and back into production as quickly as possible.
Consequently, although this Court is concerned that Evenflo was not allowed to present the jury with evidence that might show why Evenflo “‘acted as it did, or failed to act, whatever the case may be,’ ’’Opinion, ¶ 98 (quoting Sunburst, ¶ 84), the explanation afforded by the 213 compliance evidence tends, if anything, to bolster the jurors’ decision to punish Evenflo. It in no way undermines their verdict.
¶145 Lastly, it must be acknowledged that Evenflo did tell the jury about, and present evidence of, its supposed “good faith” compliance with government regulations. As the Court notes in ¶¶ 72-75, Evenflo informed the jury in its opening statement that the OMW model 207 seat was tested ‘320 times by NHTSA, by the Canadian Government, by Evenflo, by independent test labs, and it passed every test. Every test, it passed.” Evenflo contended that the Malcolms’ design expert, Lou D’Aulerio, would say that “I’ve looked at these, and the Canadians, they got it wrong, NHTSA got it wrong, the independent labs got it wrong, the car seats didn’t really pass those tests,” but Evenflo asserted that ‘he’s the only person that’s going to testify to that.” Evenflo reiterated that ‘Ttjhere is not one testing agency that has found that the 207 did not pass the test.” Then, at trial, Evenflo’s Randolph Kiser testified that unlike the OMW 206, which failed to meet the minimal requirements of FMVSS 213, the OMW 207 was never recalled. Kiser testified at length regarding the engineering changes Evenflo had made to the OMW seat after the model 206 recall, and he attempted to impugn D’Aulerio’s “best failures” chart by pointing out that D’Aulerio had included ‘failures” of model 206 seats and prototype seats in that chart. Kiser testified that NHTSA had conducted 22 tests on the model 207 seat and had not observed any cracks or any problems with the belt hooks. Similarly, Evenflo got D’Aulerio to acknowledge on cross-examination that ‘NHTSA passed all of the twenty-two tests it conducted on the model 207.”
¶146 Furthermore, as the Court notes in ¶ 76, Evenflo repeatedly tested the boundaries of the District Court’s FMVSS 213 ruling. For example, Evenflo’s counsel asked D’Aulerio, TYJou’re the only one that’s been critical of those test results” and ‘You have no information to share with these jurors that anybody other than you is critical of that testing.” The District Court sustained the Malcolms’ objection to the latter question; however, Evenflo’s counsel, undeterred, *368 nevertheless proceeded with questions such as ‘You can’t sell a child restraint system until NHTSA has deemed it safe and effective, right?” TY]ou know that NHTSA has specifically tested the model 207, that’s at question here,” ‘II]n each of the twenty-two [tests] conducted by NHTSA, NHTSA gave the tests a pass,” and “[I]n each of the eighty-five tests that the Canadian Government did, the Canadian Government deemed them a pass.” Notably, in response to these questions, D’Aulerio clarified that his “test failures” chart did not identify ‘failures”using the “other criteria”being tested (i.e., FMVSS 213). Rather, he explained, ‘I’m simply saying that when it comes to the belt hook, and the surrounding area, that all those tests show an insignia problem there. That’s all I made the list for.” This concession by D’Aulerio, in conjunction with Evenflo’s various questions about ‘test passes,’’undermines Evenflo’s contention that it was not allowed to counter the Malcolms’ “one-sided” characterization of the test results. D’Aulerio admitted on cross-examination that the model 207 had passed NHTSA’s 22 tests and that his ‘test failures” chart was not based on those same government criteria, but rather was based on problems with the belt hook.
¶147 Thus, Evenflo effectively introduced evidence that it had complied with government regulations in relation to the model 207 seat at issue. Indeed, during closing argument, Evenflo attempted to summarize the evidence as follows: ‘This product is regulated by the United States Government, by the Canadian Government, it’s been tested by both governments, by the independent labs. And every lab that man mentioned, has tested this, this 207, and not one lab -’’(The court then sustained an objection by the Malcolms.)
¶148 Moreover, Evenflo called William Van Arsdell, an engineer and design expert, who testified in essence that Evenflo’s goal in using the open belt hook design was to facilitate child safety. Van Arsdell stated that in his opinion, the open belt hook design had advantages over the Malcolms’ alternative ‘funnel” design. In particular, he offered that this design was “so much easier” and convenient to use than the tunnel design and, for this reason, that a person would be more likely to properly restrain their child in a seat which used an open belt hook design. Van Arsdell stated that he was not aware of anyone aside from D’Aulerio who had criticized the open belt hook design.
¶149 Finally, Evenflo was given free rein to use the evidence of its cooperation and interaction with NHTSA in connection with the model 206 recall to argue against liability for punitive damages. Indeed, Evenflo took full advantage of this evidence, arguing that this *369 voluntary recall was proof that Evenflo took prompt corrective action when it discovered a design defect in the OMW seat. Of course, the Malcolms used this same evidence to show (1) Evenflo’s knowledge of the shell cracks that led to the recall, (2) how Evenflo lied to NHTSA, the public, and Jessica Malcolm about how badly the OMW seat was breaking apart and the true ejection hazards posed to children riding in car seats with open belt hooks, and (3) how Evenflo’s so-called ‘fix” incorporated into the model 207 seat did absolutely nothing to eliminate the ejection hazard posed by the open belt hook design. Nevertheless, as the District Court pointed out in its order denying Evenflo’s post-trial motions, the jury saw and heard each side’s interpretation of Evenflo’s interaction with NHTSA and NHTSA’s role in the recall and the subsequent "redesign” of the OMW seat. Evenflo’s hands were not tied, nor were its arguments limited, in dealing with this evidence. The jury simply was not persuaded by the view of the evidence argued by Evenflo.
¶150 For the foregoing reasons, I would not vacate the Malcolms’ punitive damages award. I would hold that Evenflo has not demonstrated that it was prejudiced by the District Court’s exclusion of the 213 compliance evidence. For one thing, as explained in the preceding paragraphs, Evenflo was able to present and argue much of this evidence to the jury anyway. Moreover, the jury’s verdict on Evenflo’s liability for punitive damages is amply supported by substantial evidence of actual fraud and actual malice, and Evenflo has not shown that any additional 213 compliance evidence would have affected the outcome of the jury’s deliberations.
No Abuse of Discretion
¶ 151 Turning back to the question of whether evidence of Evenflo’s compliance with FMVSS 213 was even relevant in the first place, the Court states that “a good faith effort to comply with all government regulations ‘would be evidence of conduct inconsistent with the mental state requisite for punitive damages.’ ” Opinion, ¶ 93 (quoting Sunburst, ¶ 81). As the District Court correctly pointed out, however, we “obviously did not intend this very broad language to suggest that evidence of compliance with government regulations having nothing to do with the particular design issues presented in a design defect case should be admitted, despite its irrelevance.” Here, in order to sell its OMW seat, Evenflo had to certify that the product complied with FMVSS 213; and since compliance with this minimal standard was a mandatory condition on selling the product, the District Court *370 concluded that “it does not reflect a voluntary choice in the product design process.”
¶152 Moreover, the court pointed out that FMVSS 213 addresses only minimum levels of performance in 27 to 30 mile-per-hour frontal impacts and does not set forth any requirements, or create any reasonable expectations in the mind of the manufacturer, concerning the dynamic performance of a child safety seat in a motor vehicle rollover. Furthermore, the present case involves a 50 mile-per-hour rollover crash, and the dynamic forces unleashed in a high-speed rollover crash are very different from those present in a 27 to 30 mile-per-hour frontal crash. Consequently, Evenflo’s compliance with the minimal 27 to 30 mile-per-hour frontal-impact tests required by FMVSS 213 has little, if any, bearing on Evenflo’s state of mind vis-avis the known defects in its OMW seats, the known dangers posed by the seat’s open belt hook design, the expected performance of the seat in a rollover crash, Evenflo’s failure to take corrective actions, and Evenflo’s decision to make knowing misrepresentations to NHTSAand Jessica Malcolm.[2]
¶153 Of course, even if the 213 compliance evidence could be considered marginally relevant, this does not make the evidence automatically admissible. The Montana Rules of Evidence state that Tajlthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”M. R. Evid. 403. In this connection, the District Court aptly pointed out that evidence of Evenflo’s supposed “good faith” compliance with government regulations would have had the tendency to create juror confusion. Evenflo wanted to argue to the jury that because it complied with FMVSS 213, it did not knowingly misrepresent to Jessica Malcolm the risks and dangers posed by the design of the OMW seat, did not conceal from her certain material facts about the safety of the seat, and did not deliberately proceed to act in conscious disregard of the high probability of injury to Tyler. Section 27-1-221(2), (3), MCA. Yet, compliance with FMVSS 213 does not explain why Evenflo failed to ensure that OMW seats would perform above FMVSS *371 213’s minimum requirements, why Evenflo manufactured and marketed a “safety” seat that it knew was defectively designed and posed a hazard of potentially deadly ejections, and why Evenflo knowingly misrepresented to Jessica Malcolm, NHTSA, and the public that its OMW seats were safe. The District Court was thus quite correct in concluding that the 213 compliance evidence would confuse the issues and mislead the jury (not to mention waste time). M. R. Evid. 403.
¶154 Evenflo has not shown that the District Court acted arbitrarily without conscientious judgment or exceeded the bounds of reason when it excluded the evidence of Evenflo’s compliance with FMVSS 213. Seltzer, ¶ 65.1 dissent from the Court’s contrary holding.
Conclusion
¶155 The Court’s decision as to Issue 4 ignores the overwhelming evidence of Evenflo’s malice and fraud in the design, manufacture, and marketing of the OMW seat. The Court remands this case to the District Court so that Evenflo may tell a new jury that the model 207 seat complied with minimum government requirements, notwithstanding the fact that Evenflo knew that mere compliance with the minimal requirements was not enough. The Court’s decision is an affront to the jury which heard the evidence and awarded the Malcolms an appropriate amount of punitive damages.[3] The Court’s decision is also unfair to Judge Swandal, who put up with Evenflo’s pretrial discovery abuses and “gamesmanship” and then, as noted, issued exceptionally well-researched, well-reasoned, and well-written orders fully supporting his evidentiary rulings and his decisions to affirm the awards for compensatory damages and punitive damages.
¶156 The greater mischief of the Court’s decision today, however, is that Chad and Jessica Malcolm will now be forced to retry their entire case to another jury on the issue of punitive damages. Judge Swandal noted that the Malcolms’ grief from the devastating loss of their firstborn son-ejected in his Evenflo “safety” seat at a location in full view of their living room window-was “so all-consuming” that this “All American Ranch Family” was forced to move away and give up its fourth-generation ranch life and heritage. The tragedy of the Court’s *372 decision today is that Chad and Jessica are stripped of their well-deserved and legally-sound award of punitive damages in the name of ‘fairness” to a corporation that demonstrated actual malice, actual fraud, and utter contempt for the safety of the consuming public. I do not agree that Evenflo was treated unfairly or that the District Court’s evidentiary rulings in any way ‘heightened the task” of Evenflo’s defense with respect to liability for punitive damages (Opinion ¶ 86). It is, however, fundamentally unfair and unconscionable to force Chad and Jessica to relive the nightmare of Tyler’s tragic and totally unnecessary death.
¶157 As for future cases, the Court again leaves unresolved “the problem of how the District Court could have ensured that the jury considered the OMW model 207’s compliance with FMVSS 213 for purposes of punitive damages, but disregarded the same evidence for the purposes of compensatory damages.” Opinion, ¶ 102; Sunburst, ¶ 86 (“Our decision raises the problem of how the District Court could have prevented the jury from hearing evidence of DEQ’s role for purposes of compensatory damages, but allowed the jury to hear evidence of DEQ’s role for purposes of determining the appropriateness of punitive damages. We need not resolve this dilemma, however.”). I cannot understand the Court’s refusal, in two decisions now, to provide any guidance on this dilemma-a dilemma solely of this Court’s creation. Opinion, ¶ 103. Litigants and the civil justice system must not continue to be burdened, as here, with having to try often gut-wrenching cases to two different juries, first to prove entitlement to compensatory damages and then to prove entitlement to punitive damages-especially when the trial judge’s only “error” was that he simply followed decades of this Court’s precedent.
¶158 If, as the Court states in ¶¶ 44 and 100, evidence of a defendant’s compliance with government regulations is not relevant to the issue of compensatory damages (a conclusion with which I agree) but is relevant to the issue of liability for punitive damages (a conclusion with which I strenuously disagree), and if, as the Court states in ¶ 39, we are truly rejecting the approach of Restatement (Third) of Torts: Products Liability §4(b), then I suggest that punitive liability necessarily should be determined in a separate proceeding by the same jury seriatim, i.e., immediately after the jury determines tort liability and compensatory damages. This is the approach already contemplated by § 27-1-221(7), MCA, with respect to liability for punitive damages and the amount of punitive damages. Moreover, this approach is supported by our decision in Malta Public School Dist. A *373 and 14 v. Dist. Court, 283 Mont. 46, 938 P.2d 1335 (1997).
¶159 In Malta, which involved claims for breach of an insurance contract and unfair trade practices, we first noted that a court may, in furtherance of convenience or to avoid prejudice, order a separate trial of any claim, any separate issue, or any number of claims or issues. Malta, 283 Mont. at 50, 938 P.2d at 1338 (citing M. R. Civ. P. 42(b)). We then considered under what circumstances bifurcated issues should be presented to one jury seriatim or to two separate juries. We held that this determination depends on judicial economy, fairness to the parties, clarity of the issues, and convenience. Malta, 283 Mont. at 51, 938 P.2d at 1338 (citing Martin v. Bell Helicopter Co., 85 F.R.D. 654, 659-60 (D. Colo. 1980)). Thus, for example, we concluded in Malta that the School District’s breach of contract claim and its bad faith claim should be heard by the same jury because a second jury hearing the bad faith claim would first have to be educated about the underlying contract claim which the first jury had already heard and decided. Malta, 283 Mont. at 52, 54, 938 P.2d at 1339, 1340. We observed that both claims involved virtually the same evidence and the same witnesses, who would be put to the inconvenience and hardship of a second trial. Thus, “only by trying the bad faith claim immediately after the breach of contract claim to the same jury will the parties avoid relitigating the entire matter. Such a result would further the interests of judicial economy, ensure fairness to the parties, maintain clarity of the issues and provide convenience to both the court and the parties.” Malta, 283 Mont. at 52, 938 P.2d at 1339. To do otherwise, we observed, would result in a “gross injustice” and would deny the School District a “speedy remedy” on its claims. Malta, 283 Mont. at 53, 938 P.2d at 1339.
¶160 Likewise, in the run of cases, a jury considering the defendant’s liability for punitive damages will first have to be educated about the plaintiffs underlying tort claim. Except for the evidence of compliance with government regulations, the evidence and witnesses in the two proceedings will be virtually the same. Thus, if two separate juries are used, the parties will have to relitigate the entire matter, with the concomitant waste of time, money, and resources. Judicial economy, fairness to the parties, clarity of the issues, and convenience to both the court and the parties are all facilitated by trying the tort liability/compensatory damages issue and the punitive liability issue in two separate proceedings by the same jury seriatim. I suggest that this is the most practical scheme given the Court’s conflicting evidentiary rules regarding the use of evidence of compliance with *374 government regulations.
¶161 While I concur in Issues 1, 2, and 3,1 strenuously dissent as to Issue 4.
JUSTICE COTTER joins in the Concurrence and Dissent of JUSTICE NELSON.

 See Brandenburger v. Toyota Motor Sales, U.S.A., Inc., 162 Mont. 506, 513 P.2d 268 (1973) (adopting Restatement (Second) of Torts §402A (1965)); Brown v. North Am. Mfg. Co., 176 Mont. 98, 576 P.2d 711 (1978); Kuiper v. Goodyear Tire & Rubber Co., 207 Mont. 37, 673 P.2d 1208 (1983); Lutz v. National Crane Corp., 267 Mont. 368, 884 P.2d 455 (1994); Sternhagen v. Dow Co., 282 Mont. 168, 935 P.2d 1139 (1997); §27-1-719, MCA.

 Had Evenflo undertaken rollover testing of the OMW seat in an effort to comply with governmental safety regulations relating to rollover crashes, then it might be argued that evidence of such compliance is “‘evidence of conduct inconsistent with the mental state requisite for punitive damages.’ ’’Opinion, ¶ 99 (quoting Sunburst, ¶ 81). But no such evidence exists here.

 Indeed, I am certain that there is not a responsible parent in Montana-or, likely, the country-who would strap their child into an Evenflo OMW seat if, beforehand, they were presented with the facts that the Park County jury heard in this case regarding the seat and Evenflo’s conduct.